UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABS ENTERTAINMENT, INC., an Arkansas corporation, BARNABY RECORDS, INC., a California corporation, BRUNSWICK RECORD CORPORATION, a New York corporation and MALACO, INC., a Mississippi corporation, each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>CBS CORPORATION, a Delaware corporation; CBS RADIO INC., a Delaware corporation; and DOES 1 through 10,<br><br>    Defendants. | Civil Action No. 1:15-cv-06801<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

II.   FACTUAL BACKGROUND ........................................................................................ 3

    A.    Congress and the Courts Have Consistently Refused to Create or
        Recognize a Performance Right for Pre-1972 Sound Recordings. ...................... 3

    B.    Plaintiffs Own Only *Pre*-1972 Recordings ........................................................ 5

    C.    CBS Corporation and CBS Radio Inc. ................................................................. 6

III.  CBS IS ENTITLED TO PREVAIL BECAUSE THE ANSWER TO THE
     THRESHOLD FACT QUESTION—DID CBS PUBLICLY PERFORM
     PLAINTIFFS' PRE-1972 RECORDINGS—IS "NO." .................................................. 6

    A.    Plaintiffs Cannot Show That CBS Aired Their Pre-1972 Recordings. ................. 7

    B.    Post-1972 Sound Recordings Are Governed by Federal Law. ............................. 8

    C.    CBS Did Not Perform Plaintiffs' Pre-1972 Recordings. ................................... 11

IV.   CBS IS ENTITLED TO PREVAIL BECAUSE PLAINTIFFS HAVE NOT—
     AND CANNOT— STATE A LEGALLY VIABLE CLAIM FOR RELIEF ................ 14

    A.    The Copyright Infringement Claims Fail Because New York Has Never
        Recognized a Public Performance Right for Sound Recordings. ...................... 14

        1.    *Sirius* Misreads New York Common Law for Literary Works .............. 18

        2.    *Sirius* Erroneously Equates Sound Recordings With Films And
             Plays. ..................................................................................................... 20

        3.    *Sirius* Ignores New York Law Requiring Legislative Action For
             the Recognition of New Rights. ............................................................. 21

    B.    Plaintiffs' Reproduction, Distribution, And Other Claims Fail Because
        They Are Derivative Of Plaintiffs' Performance Claims. ................................... 23

    C.    Plaintiffs Cannot Prevail On Their Unfair Competition Claim. ........................ 24

V.    CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alticor Inc. v. UMG Records*,
    2015 WL 8536571 (M.D. Fla. 12/11/ 2015) .............................................................. 23

*Authors Guild, Inc. v. Hathi Trust*,
    755 F.3d 87 (2d Cir. 2014)..................................................................................... 23, 24

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
    650 F.3d 876 (2d Cir. 2011)........................................................................................ 23

*Brandon Films, Inc. v. Arjay Enterprises, Inc.*
    230 N.Y.S.2d 56 (Sup. Ct. 1962) ............................................................................... 19

*Bryant v. Maffucci*,
    923 F.2d 979 (2d Cir. 1991)........................................................................................... 7

*Camreta v. Greene*,
    563 U.S. 692 n.7 (2011) ............................................................................................... 18

*Capitol Records, Inc. v. Mercury Records Corp.*,
    221 F.2d 657 (2d Cir. 1955)................................................................................... 15, 16

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
    4 N.Y.3d 540 (2005) ............................................................................................ passim

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998)........................................................................................ 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................................... 7

*Chamberlain v. Feldman*,
    300 N.Y. 135 (1949) .................................................................................................... 22

*EMI Records Ltd. v. Premise Media Corp. L.P.*,
    No. 601209/08, 2008 N.Y. Misc. LEXIS 7485 (Sup. Ct. Aug. 8, 2008) ................... 23

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)................................................................................................. 8, 14

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
   No. 13 CIV. 5784 CM, 2015 WL 585641 (S.D.N.Y. Feb. 10, 2015)................ passim

*French v. Maguire*,
   1878 WL 11310 (N.Y. Sup. Ct. 1878) ...................................................... 19

*Griffin v. J-Records*,
   398 F. Supp. 2d 1137 (E.D. Wash. 2005) .................................................... 8

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2002) ...................................................................... 24

*Leonard Storch Enters., Inc. v. Mergenthaler*,
   No. 78–C–238, 1980 WL 1175 (E.D.N.Y. Aug.8, 1980) .......................... 24

*Maljack Prods., Inc. v. UAV Corp.*,
   964 F. Supp. 1416 (C.D. Cal. 1997), *aff'd sub nom. Batjac Prods, Inc. v.*
   *Goodtimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998) .............. 8, 9

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
   101 N.Y.S. 2d 483 (Sup. Ct. 1950) .......................................................... 25

*Palmer v. DeWitt*,
   47 N.Y. 532 (1872) ..................................................................... 15, 19, 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .......................................................... 23, 24

*Pryor v. Jean*,
   2014 WL 5023088 (C.D. Cal., Oct. 8, 2014)................................. 9, 10, 11

*RCA Mfg. Co. v. Whiteman*,
   114 F.2d 86 (2d Cir. 1940)................................................................. passim

*Roberts v. Petrova*,
   213 N.Y.S. 434 (Sup. Ct. 1925)................................................................ 19

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*
   672 F.2d 1095 (2d Cir. 1982)..................................................................... 19

*Runner v. N.Y. Stock Exch., Inc.*,
   568 F.3d 383 (2d Cir. 2009)...................................................................... 23

*Saratoga Vichy Spring Co., Inc. v. Lehman*,
   625 F.2d 1037 (2d Cir.1980)..................................................................... 25

*Scotto v. Almenas,*
    143 F.3d 105 (2d Cir. 1998)..................................................................... 7

*Smith v. Berlin,*
    141 N.Y.S.2d 110 (Sup. Ct. 1955)......................................................... 15

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984).............................................................................. 22

*Tompkins v. Halleck,*
    133 Mass. 32 (1882) ............................................................................. 19

*Werckmeister v. Am. Lithographic Co.,*
    134 F. 321 (2d Cir. 1904) ............................................................... 20, 21

*Wilkie v. Santly Bros.,*
    91 F.2d 978 (2d Cir. 1937)................................................................... 15

## Statutes

17 U.S.C. § 106........................................................................................ 14

17 U.S.C. § 107........................................................................................ 24

17 U.S.C. § 114(d)(1) ................................................................................ 5

17 U.S.C. § 114(d)(2) ................................................................................ 5

## Other Authorities

141 CONG. REC. S945-02, at 948 (Daily ed. Jan. 13, 1995) (A356)................................. 22

*Arguments Before the Comm. on Patents of the S. and H., Cojointly on the Bills S. 6630 and H.R. 19853 to Amend and Consolidate the Acts Respecting Copyright,*
    59th Cong. 26-33 (1906) (statement of Horace Pettit) ................................................ 3

*Copyright Law Revision: Hearing Before the Subcomm. of Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary,*
    90th Cong., 494 (1967) (testimony of Alan Livingston, president of Capitol Records) .............................................................................................. 17

*Digital Performance Rights: Hearing on H.R. 1506 Before the Subcomm. on Courts & Intellectual Prop. of the H. Comm. on the Judiciary,*

104th Cong., 1995 WL 371088 (June 21, 1995) (testimony of Jason S. Berman, Chairman and Chief Executive Officer, Recording Industry Association of America) ...................................................................... 17

H.R. REP. No 60-2222 at 9 (1909) ........................................................... 3

H.R. REP. NO. 104-274, at 14-15, 24 (A307-08, 17) .......................... 22

S. REP. NO. 104-128, at 15 (1995) ......................................................... 22

Sound Recording Act of 1971, Pub. L. No 92-140, 85 Stat. 391 (1971)................................. 4

Staff of Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary, 95th Cong., Performance Rights in Sound Recordings 30-34 (Comm. Print 1978) ("1978 Report").................................. 4

U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS ("U.S. Copyright Office Report") 6 (2011)........................................... 3, 16

U.S. Copyright Office, Library of Congress, Circular No. 56, *Copyright Registration for Sound Recordings* 3-4 (2014)....................................................... 10, 14

## Rules

Fed. Rule Civ. Proc. 56(a) ...................................................................... 7

## Treatises

*A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, Robert L. Bard & Lewis S. Kurlantzick, 43 Geo. Wash. L. Rev. 152 (1974) ............. 4

A TREATISE UPON THE LAW OF COPYRIGHT IN THE UNITED KINGDOM AND THE DOMINIONS OF THE CROWN, AND IN THE UNITED STATES OF AMERICA E.J. Macgillivary, 122 (1902) ................................................................. 20

*Common Law Intellectual Property and the Legacy of International News Service v. Associated Press*, Douglas G. Baird, 50 U. Chi. L. Rev. 411 (1983) .................................... 16

*Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, June M. Besek and Eva E. Subotnik, 37 Colum. J. Law & Arts 327 (2014)............. 16

*Defeating the Terminator: How Remastered Albums May Help Record Companies Avoid Copyright Termination*,
James J. Schneider, 53 B.C. L. Rev. 1889 (2012) ....................................................... 8

*Guerilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*,
Lauren Kilgore, 12 VAND. J. ENT. & TECH.L. 549 (2010)........................................ 16

MUSIC AND COPYRIGHT IN AMERICA: TOWARD THE CELESTIAL JUKEBOX
Kevin Parks, 121 (ABA 2012) .................................................................................... 4

*Radio's Most Innovative: Mediabase/Rich Meyer*,
JACOBLOG, "Sept. 5, 2014", http://jacobsmediablog.com/2014/09/05/radios-most-innovative-mediabaserich-meyer/..................................................................... 7

*Sound Recordings and Phonorecords: History and Current Law*
1979 U. Ill. L.F. 337 (1979)........................................................................................ 17

*Why Your Favorite Artists' Recordings Could Have Terrible Sound Quality*,
Steve Guttenberg, "Dec. 26, 2015", http://www.cnet.com/news/why-favorite-artists-bands-recordings-cd-mp3-could-sound-bad/ .................................................. 9

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

This is a copycat lawsuit seeking to exploit a controversial decision rendered last year that New York law is violated when anyone plays a sound recording created before February 15, 1972 without a license, whether on radio, in a restaurant, at home, or otherwise.  In *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, No. 13 CIV. 5784 CM, 2015 WL 585641 (S.D.N.Y. Feb. 10, 2015), Judge McMahon ruled that New York common law recognizes such a "performance" right. Judge McMahon recognized, however, that the legal issue was far from settled.  She certified an interlocutory appeal to the Second Circuit, which accepted review.  Based on the District Court decision, plaintiffs allege that defendants CBS Corporation and CBS Radio Inc. (collectively "CBS") violated New York law each time they broadcast a pre-1972 sound recording.

Plaintiffs' attempt to piggyback off of the *Sirius* decision is pointless.  Now that the parties have completed discovery on this issue and CBS has forensically examined the parties' sound recordings, plaintiffs cannot establish that CBS played their pre-1972 sound recordings. When CBS played any version of those songs, CBS played only ***post***-1972 reissued or remastered recordings, which are governed exclusively by federal copyright law and beyond the reach of New York law.  Under federal law, CBS has the right to perform post-1972 recordings on terrestrial radio without payment, and to play them on digital platforms under a statutory compulsory license.  Unless CBS performed a pre-1972 sound recording that plaintiffs own— which did not happen—plaintiffs have no claims arising from what CBS did perform.

Even if CBS ***had*** played one of plaintiffs' pre-1972 recordings, the claims would lack merit.  From the dawn of the recorded music industry, sound recordings have been broadcast on radio stations without restriction.  Until February 2015, no New York court had ever held that the owners of pre-1972 commercially released recordings hold a common law right to control their performance.  Indeed, for the last century, commentators and the record companies have

acknowledged that no such right exists. For decades, record companies have lobbied—unsuccessfully, and against strenuous opposition from composers and broadcasters—to require a license for the performance of such recordings.

If this Court were to follow the District Court decision on which this lawsuit is based, it would have to disregard controlling New York and Second Circuit law. In New York, common law copyright has always been focused on unauthorized *copying*. This was confirmed by Judge Learned Hand in the seminal case *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), which held that there was no public performance right for sound recordings. Years later, the Second Circuit overruled parts of *Whiteman* not germane here, but did not disturb the core holding that there is no performance right because the common law is limited to copying. Later courts, commentators, and industry participants agree that *Whiteman*'s key holding remains the law.

The *Sirius* decision disregarded *Whiteman* and the other cases limiting the scope of common law rights. *Sirius* found a public performance right for sound recordings by drawing an analogy to the limited public performance right for literary works. Not only did *Sirius* misread those decisions, it relied on an inapt analogy between literary works and sound recordings that the New York courts have rejected. Ultimately, the creation of a performance right is a complex and controversial policy decision that, under New York law, should be the product of legislative deliberation, not judicial invention.

Because there is no public performance right for plaintiffs to enforce, plaintiffs' other claims also fail. Plaintiffs cannot repackage the defective state law copyright infringement claim as unfair competition because such a claim depends on the existence of an underlying common law right. Nor can plaintiffs base their claim on any incidental reproduction or distribution that occurs as part of CBS's lawful broadcasts; such conduct is fair use.

## II.    FACTUAL BACKGROUND

### A.    Congress and the Courts Have Consistently Refused to Create or Recognize a Performance Right for Pre-1972 Sound Recordings.

The music typically heard on a radio broadcast consists of two separate pieces of intellectual property: (1) the musical work (or composition), which consists of the notes (and any lyrics) written by the composer, and (2) the sound recording created by singers and musicians in conjunction with producers and engineers.  There can be many recordings of the same composition.  Since its infancy, federal copyright law has protected only compositions.  Those rights are not at issue in this lawsuit.  Each time CBS has played a recording, including those plaintiffs claim to own, CBS has paid a royalty to the owner of the composition, usually collected by a performing rights organization, such as ASCAP, BMI, or SESAC.  *See* Declaration of Stacey Benson ¶ 2.

Until 1972, there was no federal copyright protection of any kind for sound recordings.  Before February 15, 1972, sound recordings were protected, if at all, under a "patchwork of state protection."  U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS ("U.S. Copyright Office Report") 6 (2011), Strabone Decl. Ex. 1.  As early as 1906, record companies began petitioning Congress for protection of sound recordings.  *See Arguments Before the Comm. on Patents of the S. and H., Cojointly on the Bills S. 6630 and H.R. 19853 to Amend and Consolidate the Acts Respecting Copyright,* 59th Cong. 26-33 (1906) (statement of Horace Pettit), Strabone Decl. Ex. 2.  Congress refused, and the 1909 Copyright Act expressly denied protection to sound recordings.  H.R. REP. No 60-2222 at 9 (1909), Strabone Decl. Ex. 3.

Starting in the 1920s, radio spread across the country and stations began playing records.  Record companies again asked Congress for federal protection for their sound recordings.  From

1925 to 1939, four bills were proposed.  Each failed.  *See* Staff of Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary, 95th Cong., Performance Rights in Sound Recordings 30-34 (Comm. Print 1978) ("1978 Report"), Strabone Decl. Ex. 4.

Unable to obtain federal rights in their sound recordings, record companies tried to secure a performance right through the courts.  Those efforts were stymied in 1940 when Judge Learned Hand decided *Whiteman*, 114 F.2d 86 (2d Cir. 1940).  After the Supreme Court declined to hear the appeal, *Whiteman*'s holding—there are no public performance rights for sound recordings— effectively confirmed the common law nationally.  *See* Kevin Parks, MUSIC AND COPYRIGHT IN AMERICA: TOWARD THE CELESTIAL JUKEBOX 121 (ABA 2012), Strabone Decl. Ex. 5.

In the 1940s and early 1950s, the music industry changed, and so did the record companies' lobbying goals.  They were then relying on radio broadcasts to promote sales of their product, at times *paying* radio stations to play their recordings.  *See* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo. Wash. L. Rev. 152, 155 (1974), Strabone Decl. Ex. 6.  No longer concerned with *receiving* money for the public performance of their recordings, the record companies split from performing artists and *opposed* efforts to secure performance rights in sound recordings.  1978 Report at 35-36.

Beginning in the late 1950s, however, record companies became concerned with piracy of their product.  Bootleggers were using cheap means of duplicating records to divert sales from legitimate sources.  In 1971, to limit such piracy, Congress for the first time recognized copyright protection for sound recordings.  But it limited that protection to sound recordings fixed on or after February 15, 1972, and granted a right to protect against only unauthorized *copying*.  *See* Sound Recording Act of 1971, Pub. L. No 92-140, 85 Stat. 391 (1971), Strabone

- 4 -

Decl. Ex. 7.  Aware of the decades-long controversy surrounding requests for a *performance* right for sound recordings, Congress explicitly stated that it was not creating such a right.  *Id.*

By the mid-1990s, the advent of digital media raised new concerns for record companies and performing artists.  Congress finally recognized a limited public performance right to owners of sound recordings.  17 U.S.C. § 114(d)(1).  As before, this right pertains solely to sound recordings created on or after February 15, 1972, and the amendment covers only their digital transmission.  Further, record companies must grant compulsory licenses to any broadcaster for such uses under a highly regulated scheme.  17 U.S.C. § 114(d)(2).

### B.     Plaintiffs Own Only *Pre*-1972 Recordings.

There are four named plaintiffs in this action.  ABS Entertainment, Inc. claims to own of sound recordings by Al Green, Willie Mitchell, Ace Cannon, and Otis Clay.  Barnaby Records, Inc. claims to own of sound recordings by Andy Williams, Johnny Tillotson, The Everly Brothers, Lenny Welch, Ray Stevens, and The Chordettes.  Brunswick Record Corporation claims to own of sound recordings by Jackie Wilson, The Chi-Lites, The Lost Generation, The Young-Holt Unlimited, and Tyrone Davis.  Malaco, Inc. claims to own of sound recordings by King Floyd, Mahalia Jackson, and The Cellos.

In the operative pleading, the First Amended Complaint ("FAC"), plaintiffs have identified 174 sound recordings that they claim to own.  These recordings were originally fixed before February 15, 1972.  Since then, the recordings have been remastered and reissued many times, often bearing new copyright registrations.  For example, *Tired of Being Alone* by Al Green has been re-released at least 85 times since 1972.  *See* http://www.allmusic.com/song/tired -of-being-alone-mt0033488774, (last accessed February 19, 2016).  Similarly, *Bye Bye Love* by The Everly Brothers has been re-released at least 158 times since 1972.  *See* http://www.allmusic.com/song/bye-bye-love-mt0011984624, (last accessed February 19, 2016).

### C.     CBS Corporation and CBS Radio Inc.

Defendants deliver music content through broadcast radio channels, the Internet, and mobile applications. Compl. ¶ 2. Plaintiffs allege that CBS's broadcast of sound recordings via radio stations and Internet streaming services without permission and payment violates their public performance right. *Id.* ¶ 4. They also allege that copies CBS makes to broadcast and stream recordings violate reproduction, distribution, and other exploitation rights. *Id.* ¶ 33.

Contrary to those allegations, CBS did not publicly perform any of plaintiffs' pre-1972 recordings. CBS has no record of playing any of plaintiffs' recordings in vinyl format. Sottolano Decl. ¶ 8; Neiman Decl. ¶ 4. To the best of CBS's knowledge, every song CBS has played in the three years before plaintiffs sued has been a post-1972 digital sound recording that was reissued or remastered. Sottolano Decl. ¶ 8; Neiman Decl. ¶ 6. For example, "Tired of Being Alone" is found on UMG's 2006 *The Best of Al Green* compilation. Sottolano Decl. ¶ 11, Ex. 1. That CD contains the remastered version of the song created and registered for copyright in 2000. *Id.* The "Let's Stay Together" recording CBS has is the 2003 remastered sound recording as reissued in 2009 by Fat Possum Records. Sottolano Decl. ¶ 12, Ex. 2. Every other song listed on plaintiffs' schedules that CBS has in its audio storage systems also came from a CD released after 1972 or from a digital download. Sottolano Decl. ¶ 8; Neiman Decl. ¶ 4.

### III.     CBS IS ENTITLED TO PREVAIL BECAUSE THE ANSWER TO THE THRESHOLD FACT QUESTION—DID CBS PUBLICLY PERFORM PLAINTIFFS' PRE-1972 RECORDINGS—IS "NO."

The dispositive threshold issue is whether CBS actually played plaintiffs' pre-1972 recordings. To prevail on their claims, plaintiffs must establish—for each song—that: (1) CBS played a recording of the song and, if it did, (2) the sound recording is identical to the pre-1972 recording that plaintiffs own. Once CBS has "pointed out" the deficiencies in plaintiffs' claims, plaintiffs have the burden of showing significant probative evidence in support of their claims.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  If plaintiffs cannot meet that burden, defendants are entitled to summary judgment under Fed. R. Civ. P. 56(a).  *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

### A.     Plaintiffs Cannot Show That CBS Aired Their Pre-1972 Recordings.

For the vast majority of the songs plaintiffs have put at issue in this litigation, plaintiffs have no basis for claiming that CBS publicly performed them.  There is no record of those songs ever being performed, let alone accessed by listeners in New York.  CBS has produced playlist records for its Internet streaming service for the three years before plaintiffs sued.  For its terrestrial radio service, no playlist records exist.[1]  Even if reports from third-party services, such as Mediabase,[2] were reliable and admissible, those reports show no record of CBS playing those songs in the last three years.  Sottolano Decl. ¶¶ 4-7.  Because plaintiffs have the burden of proof, CBS is entitled to summary judgment for each sound recording at issue unless plaintiffs adduce evidence that CBS played it.

------

[1] Although CBS is required by law to keep playlist records of its Internet streaming for purposes of royalty payments, it is not required to do so for terrestrial broadcasts.

[2] Mediabase is a third-party service that created logs of what radio stations play by having its employees listen to over-the-air "skim" tapes (cassettes containing seven seconds for every two minutes of air play).  CBS does not know how Mediabase currently creates its logs, but understands that it depends on a "human element" involving lay persons who identify the songs they think they are hearing on the radio.  *Radio's Most Innovative: Mediabase/Rich Meyer*, JACOBLOG, "Sept. 5, 2014", http://jacobsmediablog.com/2014/09/05/radios-most-innovative-mediabaserich-meyer/.  CBS also does not know whether these listeners attempt to differentiate between the original vs. remastered versions of a given song, much less, log such distinctions.

B.    **Post-1972 Sound Recordings Are Governed by Federal Law.**

It is not enough for plaintiffs to show that CBS publicly performed a recording with the same title and artist as a pre-1972 sound recording that plaintiffs claim to own.  It matters whether CBS played the original *pre*-1972 sound recording or whether CBS played a *post*-1972 version of that recording.  The copyright in a sound recording attaches to the specific "aural version of such work as fixed on [a] material object." 1 Melville B. Miller and David Nimmer, *Nimmer on Copyright* § 2.10[A][2].  The exclusive right in a sound recording is limited to the right to "duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording."  17 U.S.C. § 114(b).  Owners of copyrighted sound recordings are therefore "largely limited to proceeding against the tape or record 'pirate' who without permission makes a reproduction of the actual sounds in a protected recording."  *Griffin v. J-Records*, 398 F. Supp. 2d 1137, 1142 (E.D. Wash. 2005).  It matters *which* sound recording CBS played.

Federal copyright law protects remastered sound recordings as derivative works, provided that they possess a minimal degree of creativity that differs from the original.  *See Maljack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1426, 28 (C.D. Cal. 1997), *aff'd sub nom. Batjac Prods, Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998).  "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  *Maljack*,  964 F. Supp. at 1426 (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)).  "[T]hus, the degree of originality required to create a copyrightable derivative work is low."  *Id*.

The actual steps and end result of remastering a given sound recording depend on numerous factors specific to that song.  Producers and sound engineers make creative decisions to produce the best possible remaster.  *See* James J. Schneider, *Defeating the Terminator: How*

*Remastered Albums May Help Record Companies Avoid Copyright Termination*, 53 B.C. L. Rev.

1889, 1902 (2012); Inglot Decl. ¶ 13.  These decisions are guided by the participants' aesthetic

sense and technical expertise.  *Id.* ¶ 13.  Sound recordings are remastered with different goals,

based on the expected format and use of the final product.  For example, the way a recording is

engineered may depend on whether it will be released on CD or as a digital download:

> Sound quality is highly subjective, but one thing's for sure, no one sets out to
> make a bad recording.  Same for remastered recordings: No engineer would
> intentionally make a recording sound worse, but they will make one that sounds
> *different* than the original since today's listeners are likely to use mobile devices
> as their primary players.

*See* Steve Guttenberg, *Why Your Favorite Artists' Recordings Could Have Terrible Sound*

*Quality*, "Dec. 26, 2015", http://www.cnet.com/news/why-favorite-artists-bands-recordings-cd-

mp3-could-sound-bad/ (emphasis in original); Inglot Decl. ¶ 25.  The recording that results from

the remastering process can constitute a derivative work:

> In some cases, the editing of a previously recorded work may in itself involve
> such originality as to command copyright, as where it involves such acts as
> equalizing, changing the highs and lows, providing more bass and treble, adding
> echo, or abridging by making discretionary and not obvious internal cuts.…

*Pryor v. Jean*, No. CV 13-2867 2014 WL 5023088 at *4 (C.D. Cal. Oct. 8, 2014) (quoting 1

Melville B. Miller and David Nimmer, Nimmer on Copyright § 2.10 [A][2][b])

Judge Pregerson analyzed this issue in *Maljack*.  There, the Court held that "sound

enhancements" to a sound recording that "upgrade[] the quality of the sound"  are sufficient to

provide a new sound recording with federal copyright protection as a derivative work.  964 F.

Supp. at 1428.  In 1993, the plaintiff had digitized the soundtrack of a 1963 movie and, when

doing so, remastered the soundtrack through a "creative mixing and balancing of sounds."  *Id*.

The Court held that 17 U.S.C. § 114(b) "explicitly recognizes that a 'derivative work in which

the actual sounds fixed in the sound recording are rearranged, remixed or otherwise altered in sequence or quality' is a protectable new work."  *Id.*

The U.S. Copyright Office has confirmed that "remastered" sound recordings are protected as derivative works under federal copyright law, as long as there are differences that reflect minimal originality.  As it explained in its *Circular No. 56*:

> Examples of derivative sound recordings that generally can be registered include the following:
> - a remix from multitrack sources
> - a remastering that involves multiple kinds of creative authorship, such as adjustments of equalization, sound editing, and channel assignment.
>
> Mechanical changes or processes applied to a sound recording, such as a change in format, de-clicking, and noise reduction, generally do not represent enough original authorship to be registered.

*Copyright Registration for Sound Recordings*, U.S. Copyright Office, Library of Congress, Circular No. 56, 3-4 (2014), Strabone Decl. Ex. 8.

CBS is entitled to prevail on plaintiffs' state law copyright claims if CBS publicly performed post-1972 derivative works that are subject to federal copyright.  The fact that the derivative work incorporates the original pre-1972 sound recordings does not change the outcome.  Judge Pregerson addressed a similar situation in *Pryor v. Jean*, 2014 WL 5023088 (C.D. Cal., Oct. 8, 2014).  The case concerned a 1974 recording by David Pryor.  *Id.* at *1.  He later authorized a record company to remaster and reissue the song, which it did in 1975.  *Id.* Years later, the record company granted a license to Jean (and others) to copy the remastered recording for use in movies and television programs.  Pryor's heirs sued, claiming that the license from the record company was insufficient.  *Id.*  The Court dismissed the claims because the defendants did not use the 1974 sound recording; instead, they used the 1975 remastered sound recording.  *Id.* at *10-11.  The Court did so despite the fact that the remastered recording was "a literal copy" of and contained the original 1974 recording (*id.* at *1 n.1):

> Plaintiffs have the exclusive right to duplicate, rearrange, or remix the "actual sounds" of the [original] record. Defendants did not do anything with those "actual sounds." Rather, Defendants used licensed "actual sounds" from the [reissued] record.

*Id*. at *4. The court refused to permit the plaintiffs to leverage any interest they had in the original recording to constrain defendants' use of the remaster.

As explained in the next section, and as with the defendants in *Pryor*, CBS never played the "actual sounds" from plaintiffs' original pre-1972 sound recordings. Instead, CBS played the "actual sounds" from remastered versions that were created long after 1972. Plaintiffs cannot assert any New York copyright protection that they may have in a pre-1972 recording to constrain CBS's use of a post-1972 recording, whose rights are governed solely by federal law.

### C. **CBS Did Not Perform Plaintiffs' Pre-1972 Recordings**.

The parties have produced to one another all of the relevant sound recordings they possess. Plaintiffs produced copies of what they contend are their original pre-1972 "master" recordings, and CBS produced copies of the recordings located in its storage systems for each radio station at issue and for its Internet service. The undisputed evidence confirms that CBS did not play plaintiffs' pre-1972 recordings.

CBS engaged Dr. Durand Begault, an acoustic engineer, to forensically compare plaintiffs' sound recordings to the recordings CBS has of the same songs. As detailed in Dr. Begault's declaration, CBS could not have played any of plaintiffs' sound recordings because none of plaintiffs' recordings and CBS's recordings of those songs are the same. For each sound recording at issue in this case—plaintiffs' version of the song and the versions CBS used—Dr. Begault measured and then compared four objective criteria:

1. **Timbre**: "Timbre" is what causes a particular musical sound to be perceived as different from another musical sound, even when the two sounds have the same

pitch and loudness. To objectively measure timbre, Dr. Begault used recognized methods to analyze the Long Term Average Spectrum of each recording.

2. **Spatial Imagery**: This refers to "where" the listener perceives the sounds of the vocals, instruments, and other elements of a recording to be coming from , both in terms of left vs. right and front vs. rear. To objectively measure spatial imagery, Dr. Begault analyzed left-right channel correlation using a vectorscope.

3. **Sound Balance**: This refers to how the audio actually sounds to the listener's ears, i.e., its perceived loudness. When measured over the entire length of a sound recording, different versions will have different loudness "histories." To objectively measure the loudness histories of each of the sound recordings at issue in the case, Dr. Begault applied a methodology corresponding to an established broadcasting industry standard.

4. **Loudness Range**: This refers to a numerical measurement (in decibels) of the range in loudness of a recording. Using methods similar to those Dr. Begault applied to measure Sound Balance, he calculated this measure for each recording. As he explains, if two recordings of a given song are the same, the loudness ranges will necessarily be the same.

*See* Begault Decl. ¶¶ 29, 32, 40, 47-48, and 58-59.

These four objective characteristics are recognized within the field of acoustics as relevant indicia from which one experienced in the field can evaluate the similarity or dissimilarity of any two sound recordings. *Id.* ¶ 30. Using these objective tests, Dr. Begault confirmed that "CBS did not use *any version* of the sound recordings that plaintiffs claim to own." *Id.* ¶ 16 (emphasis in original). ***None*** of plaintiffs' recordings matched CBS's recordings.

The forensic testing results are consistent with the post-1972 history of plaintiffs' recordings. There exists a substantial public record of the post-1972 treatment of the sound recordings plaintiffs claim to own. One need only navigate to Amazon.com or any number of other music sites to discover the existence and production details of the many post-1972 versions of plaintiffs' recordings. A common thread that ties at least 35 of the recordings plaintiffs claim to own is that noted record producer and engineer William Inglot was responsible for creating remastered versions of those recordings, long after 1972.

Mr. Inglot has worked as a producer, sound engineer, and archivist. He has personally overseen and produced over 1,000 album releases. In his declaration, Mr. Inglot describes the steps he personally undertook to create new, remastered versions of the songs at issue here. *See* Inglot Decl., ¶¶ 31-52. He confirms the originality and creativity that went into remastering each one. For example, on *Heartaches & Harmonies*, a 1994 album by The Everly Brothers that includes *Bye Bye Love*, *Bird Dog*, *Poor Jenny*, and *Til I Kissed You*, Mr. Inglot made scores of equalization adjustments at numerous frequencies and modified loudness profiles, among other things, to create a new and distinct version of each song. *Id.* ¶ 44. These efforts make a difference in how a remaster is perceived by the listening public. Reviewers have written about Mr. Inglot's work on several of the sound recordings at issue in this case:

- "This is a great CD, with all the old favorites remastered and [sounds] so clear. I heard things in the music, that I had never heard before on vinyl." *See* Amazon.com reviews of *The Fabulous Style of The Everly Brothers*, last accessed February 25, 2016, Strabone Decl. Ex. 9.
- "The sound quality is excellent ... these will replace a lot of weaker digital transfers." *See* Amazon.com reviews of *In Yo' Face! The History of Funk* last accessed February 25, 2016, Strabone Decl. Ex. 10.

These differences between the recordings—both as objectively measured by Dr. Begault and as explained by Mr. Inglot—are not the result of what the Copyright Registrar refers to as merely "mechanical changes or processes … such as a change in format, de-clicking, and noise

reduction"; instead, they reflect "multiple kinds of creative authorship, such as adjustments of equalization, sound editing, and channel assignment." *See Copyright Circular No. 56* at 3-4, Strabone Decl. Ex. 8. Moreover, plaintiffs cannot dismiss these differences as legally de minimis. As discussed above, very little originality is needed to create a derivative work. *See Feist*, 499 U.S. at 345 ("even a slight amount will suffice").

It is telling that, in some cases, CBS has several *different* remastered versions of the same pre-1972 recording. This confirms that the differences between the original recording and the remastered version are not the inevitable result of converting to the CD format or mere de-clicking or noise reduction. Instead, these versions show the dozens of discretionary judgments that sound engineers made during the remastering process, and explain how two engineers can remaster the same recording in different ways. Inglot Decl. ¶ 14; Begault Decl. ¶ 25.

## IV. CBS IS ENTITLED TO PREVAIL BECAUSE PLAINTIFFS HAVE NOT—AND CANNOT— STATE A LEGALLY VIABLE CLAIM FOR RELIEF.

Even if the Court accepts plaintiffs' allegations as true, plaintiffs' claims fail as a matter of law. Plaintiffs' complaint assumes that New York common law recognizes a public performance right for pre-1972 sound recordings. In the more than 75 years after *Whiteman*, no one has understood that to be the law. Commentators and music industry participants have uniformly recognized that no such right exists. Until the decision in *Sirius*, courts have likewise consistently rejected the idea that such a right exists. As explained below, the Court should follow 75 years-long prevailing view, and not the criticized *Sirius* decision.

### A. The Copyright Infringement Claims Fail Because New York Has Never Recognized a Public Performance Right for Sound Recordings.

While federal copyright law enumerates a "bundle" of rights that can attach to a given work (17 U.S.C. § 106), New York common law provides just one right: "to determine whether it shall be published at all, and if published, when, where, by whom, and in what form,"

otherwise known as a right only of "first publication." *Palmer v. DeWitt*, 47 N.Y. 532, 536 (1872). New York courts have long held that this common law right is infringed if the defendant *copies* the plaintiff's work, *e.g.*, *Wilkie v. Santly Bros.*, 91 F.2d 978, 979 (2d Cir. 1937). But no court before 1940 appears to have even considered whether—much less, held that—the common law right protected against an unauthorized *performance*.

That brings us to the seminal case, *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), in which the Second Circuit confirmed that "Copyright in any form, whether statutory or at common-law […] ***consists only in the power to prevent others from <u>reproducing</u> the copyrighted work***." *Id.* at 88 (emphasis added). In *Whiteman*, RCA sued to stop the W.B.O. Broadcasting Corporation from broadcasting phonograph records of musical performances by Whiteman's orchestra that the record company owned. 114 F.2d at 88-90. Based on the principle that any right was limited to copying, Judge Learned Hand rejected plaintiff's claim and held that there was no public performance right for sound recordings at common law. *Id.*

As an additional holding, Judge Learned Hand also held that the commercial release of a sound recording divested the copyright owner of all common law rights. *Whiteman*, 114 F.2d at 88-90. The Second Circuit later overruled this second holding, but did not disturb its primary holding. *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955).

Even after *Mercury Records*, courts continued to follow *Whiteman*'s primary holding that common law copyright infringement requires copying. *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563 (2005) ("[a] copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright"); *Smith v. Berlin*, 141 N.Y.S.2d 110, 112 (Sup. Ct. 1955) ("In common-law copyright, to constitute the tortious appropriation of musical

property the proof should establish the priority of the plaintiff's composition and that the defendant with *animus furandi* obtained access to and copied it").

Commentators have uniformly recognized that common law copyright ***still*** does not include the right to control public performance of sound recordings.[3] The U.S. Copyright Office has acknowledged this consensus, citing *Whiteman* for the rule that "state law does not appear to recognize a performance right in sound recordings." U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS 44-45 (2011), Strabone Decl. Ex. 1.

Participants in the music industry shared this understanding. For decades, recording companies clamored for a federal public performance right, arguing that state law did not provide one. In 1967, for example, the president of Capitol Records testified before Congress in support of adding a performance right to control and receive compensation for airing sound recordings on the radio, acknowledging that there was no such right:

---

[3] June M. Besek and Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 Colum. J. Law & Arts 327, 338 (2014) (states do not appear to recognize right of public performance for pre-1972 sound recordings); Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press*, 50 U. Chi. L. Rev. 411, 429 n.35 (1983) ("Copyright law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances."); Lauren E. Kilgore, *Guerrilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH.L. 549, 559-60, 572 (2010) (*Capitol Records* overruled *Whiteman* on a different issue).

> The record manufacturer makes his profit, if any, solely from the sale of records.... The record company receives nothing from the widespread performance-for-profit of its products, whether on radio or television, in clubs, or restaurants.... There is no clearly established legal remedy to stop this unauthorized use of our product.

*See Copyright Law Revision: Hearing Before the Subcomm. of Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary*, 90th Cong., 494, 496, 501-02 (1967) (testimony of Alan Livingston, president of Capitol Records).

In 1979, Sidney Diamond, former counsel for the recording companies' trade association the RIAA, echoed this view in his article *Sound Recordings and Phonorecords: History and Current Law*. 1979 U. Ill. L.F. 337, 346-347, 358 (1979) (sound recordings are "the only class of performable works whose copyrights are not infringed by unauthorized performance").

Then, in its 1995 Congressional testimony, the RIAA explained that:

> Under existing law, record companies and performers … have no rights to authorize or be compensated for the broadcast or other public performance of their works.

*Digital Performance Rights: Hearing on H.R. 1506 Before the Subcomm. on Courts & Intellectual Prop. of the H. Comm. on the Judiciary*, 104th Cong., 1995 WL 371088 (June 21, 1995) (testimony of Jason S. Berman, Chairman and Chief Executive Officer, Recording Industry Association of America). In short, all interested parties have for decades agreed that there is no common law performance right for pre-1972 recordings. If there were such a right for pre-1972 sound recordings, these parties had every reason to try to enforce it.

If plaintiffs were correct, the RIAA and others testified needlessly—and worse, erroneously—before Congress to demand a right plaintiffs now claim they had all along. Plaintiffs are not correct. There has been universal understanding that under New York common law there exists no right of public performance. Until the decision last year in *Sirius*, no court in New York ever expressed a contrary view. The *Sirius* decision was wrong.

In *Sirius*, the Court was asked to decide whether the defendant, Sirius, "committed common law copyright infringement and engaged in unfair competition by publicly performing sound recordings owned by Flo & Eddie, and by reproducing those recordings in aid of its performances." 62 F. Supp. 3d 325, 330 (S.D.N.Y, 2014). Although the District Court could not identify any New York court that had ever recognized a common law performance right for sound recordings, it concluded that there was such a right. *Id.* at 338-39.

This Court is not bound to follow *Sirius*. *See Camreta v. Greene*, 563 U.S. 692 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case"). Judge McMahon acknowledged that the decision was unprecedented. 62 F.Supp.3d at 352. Conceding that the decision might also be wrong, Judge McMahon certified it for appeal to the Second Circuit, where it remains pending. *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, No. 13 CIV. 5784 CM, 2015 WL 585641, at *2 (S.D.N.Y. Feb. 10, 2015). Until the Second Circuit rules, the Court can and should independently consider the issue and rule otherwise.

In *Sirius*, the court reasoned that there must be a public performance right for sound recordings because there appeared to be one for literary works, like plays and films. That logic is flawed for three reasons. First, it misreads the law pertaining to such works. Second, under New York law, different types of copyrightable works cannot be analogized so simply, grafting rights associated with one type onto another. Third, recognition of new rights beyond the core common law power to control copying should be left to the legislature.

1.  ***Sirius* Misreads New York Common Law for Literary Works.**

In *Sirius* the court assumed that "New York courts have long afforded public performance rights to holders of common law copyrights in works such as plays […] and films." *Sirius*, 62 F. Supp. 3d at 339. As support, the decision cites five cases. These cases pertain to

unauthorized *copying*, however, and say nothing about performance.  What the *Sirius* court

assumed to include a *performance* right was a limited intervention by courts to restrain

performance based on an illegal or unlawfully obtained *copy* of the underlying composition.

Thus, in *Palmer v. DeWitt*, 47 N.Y. 532, the plaintiff, a foreign playwright's assignee,

sought an "injunction against the defendant, restraining him from printing and selling this

drama."  *Id.* at 533.  Copies of the drama "as performed, with the stage directions, etc., [] were

surreptitiously obtained."  *Id.* at 542.  Defendant, in other words, copied the play without

permission.  In ordering judgment for the plaintiff, the Court of Appeals applied the principle—

set forth in *Whiteman* and confirmed in *Naxos*—that the exclusive right conferred by common

law copyright is the power to prevent others from copying.  *Id.* at 544.

*Roberts v. Petrova*, 213 N.Y.S. 434 (N.Y. App. Div. 1925), also dealt with unauthorized

copying.  The court affirmed a verdict for the plaintiff playwright against a would-be producer of

his play who made copies of the script and passed them off as her own work.  *Id.* at 435.

*French v. Maguire*, 55 How. Pr. 471, 1878 WL 11310 (N.Y. Sup. Ct. 1878), is the only

case *Sirius* cited that involved an injunction against performing a play.  Although superficially

supportive of the *Sirius* conclusion, the holding in *French* is just another application of the

common law prohibition against unauthorized copying.  Courts citing *French* have explained

that the case stands for "the proposition that the representation of such a play, *the copy of which*

*has been unlawfully obtained*, will be restrained by injunction."  *Tompkins v. Halleck*, 133 Mass.

32, 39 (1882).  The injunction was a remedy granted because a copy had been stolen.

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, also

involved performance of an unlawfully obtained **copy**, in that case of an unpublished compilation

of Charlie Chaplain film clips.  672 F.2d 1095 (2d Cir. 1982).  *Brandon Films, Inc. v. Arjay*

*Enterprises, Inc.*, another film case cited in *Sirius*, held that, under the facts of the case, public

exhibition of two films had not published them so as to terminate their common law protection. 230 N.Y.S.2d 56 (Sup. Ct. 1962). Neither case recognized a right to restrain performance of a *lawfully* obtained copy of the underlying work.

At most, these cases suggest that if someone had stolen the unpublished sheet music underlying the recordings plaintiffs claim to own, the composer could sue the thief to prevent his performance of that sheet music. None of the cases demonstrates the existence of the common law right to enjoin performance of a *lawfully obtained copy* of a work or, more precisely, a lawfully obtained copy of a recorded performance of that work. That is the right plaintiffs seek to enforce. As *Whiteman* held and *Naxos* confirmed, that right does not exit.

## 2. *Sirius* Erroneously Equates Sound Recordings With Films And Plays.

Even if the cases *Sirius* cites showed that plays and films enjoy a common law performance right, this Court could not properly conclude, as *Sirius* did, that sound recordings enjoy that right. That is because New York common law explicitly treats literary works, such as plays and films, differently from sound recordings. *Naxos*, 4 N.Y.3d at 560-61 (contrasting literary works and sound recordings); *Werckmeister v. Am. Lithographic Co.*, 134 F. 321, 326 (2d Cir. 1904) (contrasting books, plays, lectures, and paintings).

It is error to simply assume, as *Sirius* did, that what is true for literary works will be true for sound recordings. They involve different subject matter and public policy. For example, as the *Naxos* court explained, the common law defines "publication" for literary works as distribution to the public. *Naxos*, 4 N.Y.3d at 560. Yet for sound recordings it does not. *Id.* Those conflicting rules exist, as *Naxos* explains, because the policies and circumstances of literary works and sound recordings are not the same.

If anything, the *Naxos* distinction shows that, precisely because literary works differ from sound recordings, the latter would not enjoy a public performance right. *See* E.J. Macgillivary,

A Treatise Upon The Law Of Copyright In The United Kingdom And The Dominions Of The Crown, And In The United States Of America 122 (1902) ("At common law there was no performing right in the proper sense of the term, but an unpublished manuscript was protected from performance as from any other invasion of the author's exclusive right to it.").  The reason courts grant even a limited right to enjoin performance of literary works produced from unlawful copies is because disseminating a play or film to the public would end its common law protection.  *See Naxos*, 4 N.Y.3d at 551; *Werckmeister*, 134 F. at 321.  Because this can occur even when someone other than the author disseminates the work with apparent consent, courts have occasionally allowed the author to prevent such conduct.  *See Palmer*, 47 N.Y. at 543.  But for sound recordings, dissemination would ***not*** end its protection, so the policy rationale for a limited performance right under common law would not apply.  *Naxos*, 4 N.Y.3d at 560.

### 3.    *Sirius* Ignores New York Law Requiring Legislative Action For the Recognition of New Rights.

The limited performance right for literary works underscores the error in *Sirius* in creating such a right for sound recordings.  New York's highest court held in *Palmer* that any right over the public performance of literary works was not an inherent part of the common law:

> Until the passage in England of the statutes 3 and 4 William IV (chap .15), an author could not prevent any one from publicly performing on the stage any drama in which the author possessed the copyright.  He could only prevent the publication of his work by multiplication of copies of it.  It could be produced on the stage from published copies, and repeating a piece on the stage from memory was not a publication in violation of the author's right first to print and publish; that is, the right known as "copyright before publication."

47 N.Y. at 542.  Instead, any performance right was the result of legislative action—first in Britain by statutes 3 and 4 William IV and then "in 1856, by act of congress (11 Stats. at Large, 138), a like right was given to authors and proprietors of dramatic compositions, for which a copyright should thereafter be granted under the laws of the United States."  *Id*. at 543.

Under New York law, where creating a new right would dramatically alter the common law and profoundly affect the interests of many competing stakeholders, the creation of that right must be left to legislative judgment.  *See Chamberlain v. Feldman*, 300 N.Y. 135, 140 (1949) ("any such change of public policy must be the doing of the Legislature").  Balancing competing policy interests should be left to legislative bodies.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984) (noting "[t]he judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance ….").

The history of Congress's creation in 1995 of a limited digital performance right for post-1972 sound recordings demonstrates the wisdom of the New York courts' choice to leave creation of such a right to the legislature.  With the enactment of the Digital Performance Rights in Sound Recordings Act ("DPRA"), which established that limited performance right, Congress had to balance the competing interests of recording owners, music composers, broadcasters and others who had come to rely on the ability to perform post-1972 works largely without restriction.  141 Cong. Rec. S945-02, at 948 (Daily ed. Jan. 13, 1995) (A356) (DPRA's sponsor rejecting unlimited performance right because the "long-established business practices within the music and broadcasting industries represent a highly complex system of interlocking relationships … and should not be lightly upset.").  Striking that balance required Congress to, among other things, to: (1) enact carve-outs from the DPRA, including one for terrestrial radio broadcasters, "which often promote, and appear to pose no threat to, the distribution of sound recordings" (S. REP. NO. 104-128, at 15 (1995)), (2) establish a compulsory licensing scheme to ensure the public's continued access to sound recordings that would now be subject to copyright (*id*. at 15-16), and (3) require recording owners to share half of any compulsory license fees with performing artists.  H.R. REP. NO. 104-274, at 14-15, 24 (A307-08, 17).

It is particularly inappropriate for a federal court to create such a right. "[A] federal court sitting in diversity [must] not [] adopt innovative theories that may distort established state law." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009). Recognizing a performance right here is not only "unprecedented," but "will have significant economic consequences" and "could upend the analog and digital broadcasting industries." *Sirius*, 62 F. Supp. 3d at 352. That is not this Court's prerogative: "federal courts … cannot create New York common law." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 911 n.3 (2d Cir. 2011).[4]

**B.  Plaintiffs' Reproduction, Distribution, And Other Claims Fail Because They Are Derivative Of Plaintiffs' Performance Claims.**

Plaintiffs allege that CBS made copies of the contested recordings in order to "transmit, copy, perform, broadcast, and stream them to its millions of users …." Compl. ¶ 6. Plaintiffs claim this copying violates its exclusive rights to reproduction, distribution, and exploitation. *Id.* ¶ 33. Putting aside the factual inaccuracy of this statement, these claims also have no merit.

Copying that is incidental to an otherwise lawful exercise of rights cannot be actionable under the "fair use" doctrine. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1167-1168 (9th Cir. 2007); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) (maintaining copies of works at multiple locations was "reasonably necessary in order to facilitate [] legitimate uses"). New York applies the fair use doctrine in accordance with the four-factor test codified in the federal Copyright Act. *EMI Records Ltd. v. Premise Media Corp. L.P.*, No. 601209/08, 2008 N.Y. Misc. LEXIS 7485 at *17-19 (Sup. Ct. Aug. 8, 2008). Thus,

---

[4] For similar reasons, federal courts have refused to create a performance right under Florida common law. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 3852692, at *5 (S.D. Fla. 6/22/2015); *Alticor Inc. v. UMG Records*, 2015 WL 8536571, at *7 (M.D. Fla. 12/11/ 2015).

New York courts consider:  (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

Applying these factors, the incidental copying plaintiffs allege is fair use as a matter of law.  First, to the extent CBS copied plaintiffs' sound recordings, it was "necessary for [CBS's] intended use" of broadcasting those recordings to the public.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003).  Second, the alleged copyrighted works are "previously published" sound recordings, not entitled to protection under either federal or common law.  *Authors Guild*, 755 F.3d at 93.  By transmitting those recordings to the public "in a different context," CBS's broadcasts transformed the recordings "into [] new creation[s]."  *Perfect 10,* 508 F.3d at 1165.  Third, to the extent CBS allegedly copied entire recordings, it did so because such copying was essential to CBS's intended use of the recordings in lawful broadcasts to the public.  *Kelly*, 336 F.3d at 821.  Fourth, because CBS uses any copies it allegedly creates solely for CBS's lawful broadcasts, and not as "substitutes for the market of the original work," plaintiffs cannot show any harm to the potential market for or value of the recordings.  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998).

## C.  Plaintiffs Cannot Prevail On Their Unfair Competition Claim.

Since plaintiffs have no public performance rights in the sound recordings, they also cannot charge CBS with unfair competition.  Unauthorized copying without exclusive, cognizable rights to the property is not actionable.  *See Naxos*, 262 F. Supp. 2d at 213 (citing *Leonard Storch Enters., Inc. v. Mergenthaler*, No. 78–C–238, 1980 WL 1175, at *30 (E.D.N.Y. Aug.8, 1980) ("[N]o New York case has ever recognized a right of unfair competition based solely on the copying or photocopying of a tangible product."), *aff'd*, *Leonard Storch Enters., Inc.*, 659 F.2d 1060 (2d Cir.1981)).  It is "not enough for [a plaintiff] to allege that [the

defendant] copied [] the original recordings without authorization, but [a plaintiff] must first show that it has a legally protected interest in these recordings." *Id.*

Moreover, CBS has not acted in bad faith. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) ("[c]entral [to an unfair competition claim] is some element of bad faith."). New York's unfair competition legal framework "developed within the framework of a society dedicated to freest competition, to deal with business malpractices *offensive to the ethics of that society*." *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S. 2d 483, 488 (Sup. Ct. 1950) (emphasis added). CBS has done nothing offensive; CBS has legally broadcast sound recordings to the public. Because plaintiffs have cognizable rights to the sound recordings, and CBS cannot be liable for unfair competition.

## V.    CONCLUSION

For the foregoing reasons, CBS respectfully requests that the Court grant summary judgment in its favor. Alternatively, the Court should grant partial summary judgment in favor of CBS as to each song at issue for which plaintiffs fail to create a triable issue of fact as to whether CBS performed the version of that song plaintiffs' claim to own.

Dated:  February 26, 2016                    Respectfully submitted,

By: _Robert M. Schwartz_
       Robert M. Schwartz

Robert M. Schwartz
Victor Jih
Andrew J. Strabone
Amit Gressel
IRELL & MANELLA LLP

Michael C. Lynch
James B. Saylor
KELLEY DRYE & WARREN LLP

*Attorneys for Defendants*