UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABS ENTERTAINMENT, INC., an Arkansas corporation, BARNABY RECORDS, INC., a California corporation, BRUNSWICK RECORD CORPORATION, a New York corporation and MALACO, INC., a Mississippi corporation, each individually and on behalf of all others similarly situated.<br><br>     Plaintiff,<br><br>  v.<br><br>CBS CORPORATION, a Delaware corporation; CBS RADIO INC., a Delaware corporation; and DOES 1-10,<br><br>     Defendants. | Civil Action No.: 15-cv-06801<br><br>Judge John G. Koeltl<br><br>Magistrate James L. Cott<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

# <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION**................................................................................................1

II.     **STATEMENT OF FACTS**.................................................................................3

    A.  Plaintiffs Own Pre-1972 Recordings ...........................................................3

    B.  CBS Publicly Performed Copies of Plaintiffs' Pre-1972 Recordings .........6

    C.  CBS Lacked Authorization or the Legal Right to Broadcast or Stream Copies of Plaintiffs' Pre-1972 Sound Recordings ....................................................7

III.    **CBS IS NOT ENTITLED TO SUMMARY JUDGMENT**...........................8

    A.  Substantial Evidence Confirms that CBS Played Plaintiffs' Recordings ....8

        1.  CBS Does Not Dispute That It Played 57 Of Plaintiffs' Remastered Recordings ..8

        2.  Triable Issues Of Fact Exist As To CBS's Public Performance Of Plaintiffs' Other Recordings ...........................................................10

    B.  The Remastered Copies That CBS Performed Are Pre-1972 Sound Recordings Governed Under New York, Not Federal Law ............................................11

        1.  Remastering Pre-1972 Recordings Does Not Convert Them Into Post-1972 Recordings ...........................................................11

        2.  CBS Performed Plaintiffs' Remastered Pre-1972 Recordings, Not New Post-1972 Recordings .........................................................16

IV.     **CBS HAS EXPLOITED PLAINTIFFS' PRE-1972 RECORDINGS WITHOUT PERMISSION** ...............................................................................20

    A.  New York Common Law Provides Exclusive Rights To Publicly Perform And Reproduce Pre-1972 Recordings .................................................................20

        1.  New York Common Law Recognizes An Unabridged, Exclusive Property Right To Exclude Others From Profiting From The Labor, Skill, Expenditure, Name And Reputation of Others ....................................................20

        2.  The Rights of Property Owners of Sound Recordings Are Not Limited To A Single, Limited Right of "First Publication" ......................................21

3.  The Exclusive Right To Public Performance Of A Pre-1972 Recording Is Not Abrogated By The Failure To Enforce ...................................................................22

4.  Legislative Action Is Not Necessary To Recognize A Protectable Interest In The Public Performance of Pre-1972 Recordings ...................................................22

5.  *Flo & Eddie* Correctly Interpreted New York Common Law ..............................23

B.  New York Common Law Provides Exclusive Rights To Reproduce Pre-1972 Recordings, And the Fair Use Doctrine Does Not Apply.............................................23

C.  CBS Is Not Entitled To Summary Judgment On Plaintiffs' Unfair Competition Claim........................................................................................................24

V.  **CONCLUSION** ...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Agee v. Paramount Communications, Inc.,*
  59 F.3d 317 (2d Cir. 1995) .................................................................... 24

*Agee v. Paramount Communications, Inc.,*
  853 F. Supp. 778 (S.D.N.Y. 1994), aff'd in part on other grounds, rev'd in part on other
    grounds, 59 F.3d 317 (2d Cir. 1995) ...................................................... 13

*Campbell v. Acuff-Rose Music,*
  510 U.S. 569 (1994) ............................................................................. 24

*Capitol Records, LLC v. Escape Media Group, Inc.,*
  2015 U.S. Dist. LEXIS 38007 (S.D.N.Y. Mar. 25, 2015) ......................... 20

*Capitol Records v. Mercury Records Corp.,*
  221 F.2d 657 (2d Cir. 1955) .................................................................. 21

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  262 F. Supp. 2d 204 (S.D.N.Y. 2003) .................................................... 12

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  372 F.3d 471 (2d Cir. 2004) .................................................................. 12

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  4 N.Y.3d 540 (2005) ............................................................... 12, 13, 21, 22

*Capitol Records, Inc. v. Wings Digital Corp.,*
  218 F. Supp. 2d 280 (E.D.N.Y. 2002) .................................................... 24

*Capitol Records, LLC v. ReDigi Inc.,*
  934 F. Supp. 2d 640 (S.D.N.Y 2013) ..................................................... 20

*Dickman v. Comm'r,*
  465 U.S. 330 (1984) ............................................................................. 21

*Durham Indus., Inc. v Tomy Corp.,*
  630 F.2d 905 (2d Cir. 1980) ..................................................... 12, 13, 18, 19

*Ets-Hokin v. Skyy Spirits Inc.,*
  225 F.3d 1068 (9th Cir. 2000) ............................................................... 17

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
  62 F. Supp. 3d 325 (S.D.N.Y. 2014) ............................................ 20, 22, 23

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
  2014 U.S. Dist. LEXIS 174907 (S.D.N.Y. Dec. 12, 2014) .................................................. 20, 21

*Freeplay Music, Inc. v. Cox Radio, Inc.,*
  404 F. Supp. 548, 551 (S.D.N.Y. 2005) ................................................................................ 24

*Gilliam v. American Broadcasting Cos.,*
  538 F.2d 14 (2d Cir. 1976) .................................................................................................... 19

*Gracen v. Bradford Exchange,*
  698 F.2d 300 (7th Cir. 1983) ................................................................................................ 18

*L. Batlin & Son, Inc. v. Snyder,*
  536 F.2d 486 (2nd Cir. 1976) ........................................................................................ 13, 18

*Maljack Productions v. UAV Corp.,*
  964 F. Supp. 1416 (C.D. Cal. 1997) ..................................................................................... 14

*McCormick v. Cohn,*
  1992 U.S. Dist. LEXIS 21187 (S.D. Cal. July 31, 1992) ...................................................... 18

*Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.,*
  199 Misc. 786 (Sup. Ct. 1950) aff'd, 107 N.Y.S.2d 795 (App. Div. 1951) ......................... 20, 21

*Mr. Water Heater Enter., Inc. v. 1-800-Hot Water Heater, LLC,*
  648 F. Supp. 2d 576 (S.D.N.Y. 2009) ................................................................................... 25

*N.Y. Times Co. v. Tasini,*
  533 U.S. 483 (2001) .............................................................................................................. 13

*Palmer v. DeWitt,*
  47 N.Y. 532 (1872) .......................................................................................................... 21, 22

*Pryor v. Jean,*
  2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014) ................................................. 14, 15

*RCA Mfg. Co. v. Whiteman,*
  114 F.2d 86 (2d Cir. 1940) ................................................................................................... 21

*Roy Export Co. Estmt. of Vaduz, Liechtenstein, Black, Inc. A.G. v. Columbia Broad. Sys., Inc.,*
  503 F. Supp. 1137 (S.D.N.Y 1980) ....................................................................................... 24

*Stewart v. Abend,*
  495 U.S. 207 (1990) .............................................................................................................. 19

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,*
  692 F.3d 1009 (9th Cir. 2012) ................................................... 19

*United States v. Taxe,*
  380 F. Supp. 1010 (C.D. Cal. 1974) .................................. 13, 15

*Wilkie v. Santly Bros.,*
  91 F.2d 978 (2d Cir. 1937) ........................................................ 21

*Wood v. Bourne Co.,*
  60 F.3d 978 (2d Cir. 1995) ........................................................ 18

**Statutes**
17 U.S.C. § 103(a) ...................................................................... 18
17 U.S.C. § 103(b) ...................................................................... 19
17 U.S.C. § 106(2) ...................................................................... 19
17 U.S.C. § 301(c) ................................................ 11, 15, 18, 20
17 U.S.C. § 302(a) ...................................................................... 15

**Other Authorities**
1-3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 3.01 ................................. 18

*Music Licensing Study: Second Request/or Comments,*
  79 Fed. Reg. 42,833-01, 42,834 n.3 (July 23, 2014) ................................. 22

I.     **INTRODUCTION**

The "narrow factual question" that CBS raises in its motion—whether CBS played Plaintiffs' pre-1972 sound recordings ("pre-1972 recordings")—must be answered "yes." CBS publicly performed Plaintiffs' pre-1972 recordings, without Plaintiffs' consent, over its terrestrial radio stations and through its "Radio.com" website. Those recordings capture performances that took place prior to February 15, 1972, for which there is no federal copyright protection as derivative works or otherwise. Although CBS played copies of Plaintiffs' recordings— "remastered" from the original analog format into digital formats and placed on compact disc ("CD") albums—those remastered copies are ***also not*** protected under federal copyright law. Indeed, the undisputed facts show that no one has ever claimed a federal copyright for the post-1972 remastered copies of Plaintiffs' pre-1972 recordings at issue in this case.

It is not just that federal law precludes new copyrights for the remastered copies that CBS played; the licenses authorizing the reproduction and distribution of Plaintiffs' original pre-1972 analog master recordings in digital formats did not authorize any creative modifications that could have been separately copyrighted under federal law. Paul Geluso, a Master Teacher of Music Technology at NYU and recognized expert in sound recording, examined Plaintiffs' pre-1972 recordings, compared them with the audio files that CBS broadcast, and confirmed that no such modifications were made. After performing his analysis, Mr. Geluso concluded that in 202 of the 219 songs compared, the sound recording in CBS's audio file copy captured the identical pre-1972 performance in Plaintiffs' original master recording. Mr. Geluso further concluded that, of the 202 sound files that contain the identical performances (Declaration of Paul Geluso, ¶¶ 10-11):

- None of the sound recordings contain any re-mixing of Plaintiffs' original sound recordings.

1

- None of the sound recordings contain any editing of Plaintiffs' original sound recordings.

- None of the sound recordings contain added sounds or sounds that were deleted.

- The sound recordings in the CBS sound files embody the original master sound recordings owned by the Plaintiffs.

CBS relies on irrelevant declarations from Dr. Begault and Mr. Inglot. Dr. Begault performed four "tests" (applying his self-created pass/fail standards never before used in a copyright analysis) to conclude that the remastered audio files CBS played are not "identical" duplicates of Plaintiffs' original master recordings. CBS did not need an expert or any tests to reach that conclusion. Remastering from an analog to digital format alone necessarily results in processing changes to a sound recording, but does not make the remastered copy a new creative work subject to a separate federal copyright. Mr. Inglot testified that he remastered some of Plaintiffs' pre-1972 recordings from analog to digital format and, as part of the remastering, made mechanical processing adjustments to the recorded sounds—just like one may adjust bass and treble using stereo knobs. Even if CBS played sound recordings remastered by Mr. Inglot— and CBS offers no evidence that it did—this too lacks any relevance. Mr. Inglot testified that he did not remix, edit, add sounds to, or delete sounds from any of Plaintiffs' pre-72 sound recordings, and Dr. Begault admittedly found no such changes in CBS's copies.

Federal law does not treat remastered sound recordings as separate copyrightable works, particularly when only mechanical processing adjustments are made to optimize the recording for a particular technological format. Without (at the very least) remixing, editing, adding sounds to, or deleting sounds from the original recording, federal law does not recognize the remaster as a newly protectable work. The evidence shows that, at most, the remastered copies of Plaintiffs' pre-1972 recordings publicly performed by CBS were simply converted from analog to digital format and contain only mechanical processing without any creative remixing, editing, or sound

additions or deletions. Thus, the remastered sound recordings in CBS's possession not only lack federal copyrights, but are ineligible for federal copyright protection.

There is no dispute that CBS publicly performed in New York a substantial number of Plaintiffs' sound recordings. As to many other sound recordings belonging to Plaintiffs, material facts regarding CBS's performance in New York remain disputed.  Further, New York common law provides exclusive rights to publicly perform and reproduce pre-1972 recordings. Under these facts and the law, CBS's motion must be denied.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs Own Pre-1972 Recordings

Plaintiffs ABS Entertainment, Inc., Barnaby Records, Inc., Brunswick Record Corporation and Malaco, Inc. own sound recordings of musical performances that initially were fixed (*i.e.*, recorded) prior to February 15, 1972 ("pre-1972 recordings"). (Plaintiffs' Statement of Additional Material Facts ("AMF") at 1.) These sound recordings capture the original studio performances by, among other artists, Al Green, Andy Williams, the Chi-Lites, Jackie Wilson, Ray Stevens, the Everly Brothers, the Chordettes and King Floyd. (*Id.*) For decades, Plaintiffs have been engaged in the business of distributing, selling, and licensing the reproduction, distribution, sale, and performance of sound recordings for use in (among other things) albums, CDs, audiovisual works, and for streaming and downloading over the Internet. (AMF 2.)

Plaintiffs' pre-1972 recordings, recorded in the analog format, before the digital format existed, are the final mixed sound recordings of an artist's performance (commonly referred to as the "master recordings"). (AMF 3.) Plaintiffs (or their predecessors) then applied the "mastering process" to each of the pre-1972 recordings to create a copy optimized for the vinyl record format—sometimes referred to as the "duplication master." (*Id.*) The duplication master and the master recording are identical in that both embody the identical performance and final mix of the

3

musical artist, as originally fixed. (*Id.*)

Plaintiffs had similar copies made from the master recording to serve as the duplication master for other formats, including analog cassette tapes and 8-track tapes (applying the "mastering process" again, sometimes referred to as "remastering") to optimize the pre-1972 sound recording for the applicable format. (AMF 4.) With the advent of digital recording, Plaintiffs created a digital transfer copy of the pre-1972 recordings. (*Id.*) Although advancements in recording technology allowed for mechanical processing adjustments to optimize the recording for the new formats, the remastering of Plaintiffs' recordings did not include remixing, editing, resequencing, adding new sound or removing sounds. (Geluso Decl. ¶¶ 10, 25.) Thus, the "remastered" recordings remained identical to the originally mastered recording in that the actual sounds of the artist's performances fixed in the originally mastered recording are the same as the actual sounds of the artist's performances fixed in the remastered recording—with only mechanical adjustments made to optimize the sound in the new format. (Geluso Decl. ¶ 25.)

For some pre-1972 recordings, Plaintiffs granted licenses allowing for the distribution of the recordings, including distribution as part of "compilation albums" with other sound recordings. (AMF 5.) Any licenses, however, only allowed the licensee to reproduce and distribute Plaintiffs' recordings and not to create derivative works or to make any substantial, non-trivial changes to the sound of these recordings. (*Id.*) For example, Plaintiffs licensed sound recordings to Rhino Entertainment Company ("Rhino") for distribution.  In some cases, Rhino may have remastered the recordings for its compilation albums in digital formats, including CD. (AMF 6.)  But, as explained by Robert Emmer, Rhino's then Executive Vice President and Head of Business and Legal Affairs, Rhino was never authorized to create, nor claimed to have created, a derivative work from any of Plaintiffs' pre-1972 recordings. (AMF 8.) Thus, Rhino never claimed any ownership or copyright interest in any of the remastered recordings of Plaintiffs' works. (*Id.*)

CBS's declarant, William Inglot, testified that he remastered some of Plaintiffs' pre-1972 recordings for Rhino, but does not know whether any of Plaintiffs' pre-1972 recordings that he remastered were the copies that CBS played over the air or through Internet streaming. (AMF 7.) Likewise, Mr. Inglot testified that he never claimed a federal copyright for any remastering work he did. (AMF 9.) Mr. Inglot also testified that, in remastering Plaintiffs' pre-1972 recordings, he never did any remixing, editing, resequencing, or adding sounds or deleting sounds. (*Id.*) Nor does Mr. Inglot dispute Plaintiffs' ownership claims in the sound recordings at issue. (*Id.*) In fact, Mr. Inglot readily admitted that he used the sounds of Plaintiffs' original master recordings in the remasters. (*Id.*) While Mr. Inglot declared that he made "significant and noticeable alternations and modifications" in the remastering process, (*Id.*), he admitted that he could not recall any specific change to a particular recording and that his "modifications" amounted to nothing more than "doing a good job" according to his subjective determination. (*Id.*)

Plaintiffs retained all right, title, and interest in the ownership of their respective pre-1972 recordings. These ownership rights extend to all remastered recordings distributed under license, whether by Rhino or others, and regardless of the format onto which the recordings were remastered or the medium on which they were stored. (AMF 10.)

CBS does not offer any admissible evidence that any other entity claims ownership in a remastered copy of Plaintiffs' pre-1972 recordings. To compensate for the lack of evidence, CBS offered declarations from two employees—Seth Neiman and Jeff Sottolano—for facts those witnesses subsequently admitted were not within their knowledge. In sworn declarations written by CBS attorneys, these witnesses testified that various entities claimed post-1972 "sound recording copyrights" in the remasters of Plaintiffs' pre-1972 recordings. (AMF 11.) Yet, when confronted at deposition with the actual copyright registrations for the CD compilation album (which show copyrights in the artwork, liner notes and for the compilation album itself, *but not any copyrights in the included sound recordings that are the subject of this action*), both

5

witnesses admitted that they, in fact, had no knowledge as to whether "sound recording copyrights" were claimed in any of the remastered copies of the works. (AMF 12-13) Worse, both declarants were unfamiliar with copyright notices in general and conceded that they never reviewed the actual copyright registrations for the CD compilation albums at issue before signing their declarations. (*Id*). More troubling, neither Messrs. Neiman nor Sottolano could explain why they testified under penalty of perjury that "sound recording copyrights" existed in the remastered works when each admitted they had no information on which to base that sworn testimony. (*Id*.)

    **B.**    **CBS Publicly Performed Copies of Plaintiffs' Pre-1972 Recordings**

In their First Amended Complaint ("FAC"), Plaintiffs collectively identified 174 exemplary pre-1972 recordings owned by them, which they contend CBS publicly performed without consent. (AMF 15.)  CBS publicly performed these recordings in two ways.

*First*, CBS digitally streamed Plaintiffs' sound recordings over the Internet from the CBS-owned website, Radio.com. CBS streams sound recordings on Radio.com from two sources through servers maintained in New York City: One source originates from CBS's own "exclusive," Internet-only stations—which CBS creates and programs for Internet streaming. The other source originates from "simulcasts" of CBS terrestrial radio AM, FM and HD radio broadcast stations located in the United States. Through the Radio.com website, a user can listen to simulcasts of all 80 CBS-owned music radio stations from anywhere in the United States. (AMF 16.)  Every song that CBS broadcasts from any CBS-owned radio station in the United States, as well as every song played over CBS's "exclusive" Internet radio stations, are streamed from New York, and can be accessed anywhere in the United States through a web browser or smart phone application.

*Second*, CBS broadcasts Plaintiffs' pre-1972 recordings over terrestrial airwaves from

CBS-owned radio stations in New York and elsewhere by traditional AM and FM signals and by HD signals on HD Multicast stations. (AMF 17.)

CBS admits that it broadcast or streamed at least 57 sound recordings that Plaintiffs claim to own. Substantial evidence shows that CBS broadcast or streamed more. CBS's records of the sound recordings it publicly performed demonstrate that it performed at least 88 of Plaintiffs' pre-1972 recordings during the period commencing three years prior to this litigation. (AMF 18.)

### C.   CBS Lacked Authorization or the Legal Right to Broadcast or Stream Copies of Plaintiffs' Pre-1972 Sound Recordings

CBS does not contend that Plaintiffs (or anyone else) licensed or authorized it to publicly perform the remastered copies of Plaintiffs' pre-1972 recordings. Rather, CBS's motion is premised on the baseless assertion that the copies of Plaintiffs' sound recordings that CBS used to broadcast or stream are covered by federal copyright law, not state law.

CBS is wrong. Application of federal copyright law does not turn on "whether any 'remastered' or 'reissued' recording is *identical* to the original pre-1972 recordings plaintiffs claim to own." (Mot. at 6 (emphasis added).)  Converting sound recordings from one format into another, along with mechanical sound adjustment to optimize the copy for the new format, does not create a new derivative work protectable under federal copyright law. Indeed, the U.S. Copyright Office's Circular No. 56—the same publication CBS relies on (Mot. at 10)—expressly states that the "preexisting recorded sounds must have been rearranged, remixed, or otherwise altered in sequence or character, or there must be some additional new sounds" before a new, derivative work copyright will attach. (AMF 19.) The Circular further confirms that "[m]echanical changes or processes applied to a sound recording" are not enough to warrant a new copyright registration. If the law were otherwise, the owner of a sound recording could extend copyright protection indefinitely by periodically remastering a work into new formats.

To the extent that CBS publicly performed remastered copies of Plaintiffs' pre-1972

recordings, such remastered copies were simply digital conversions optimized for the digital format using only mechanical processing. CBS does not offer any evidence that any of the remastered copies of Plaintiffs' pre-1972 recordings in its possession have been remixed, edited, re-arranged, altered or modified with new sounds. Thus, the remastered copies are not subject to federal copyright protection.

## III.   CBS IS NOT ENTITLED TO SUMMARY JUDGMENT

CBS does not dispute that Plaintiffs own the sound recordings of performances identified in Schedules A1-A4 of the FAC.  Nor does CBS dispute that it maintains at least 57 of those sound recordings on its servers and has broadcast or streamed those recordings. CBS's sole defense—that it broadcast and streamed "remastered" copies of Plaintiffs' sound recordings in a digital format rather than the "identical" pre-1972 recording in the original vinyl format—does not excuse its unlawful exploitation. CBS's copies of the performances are still pre-1972 recordings, regardless of the conversion from analog to digital format and regardless of the mechanical remastering processing to optimize the sound for that digital medium.

### A.   Substantial Evidence Confirms that CBS Played Plaintiffs' Recordings

CBS's contention that it is entitled to summary judgment because "plaintiffs have no basis for claiming that CBS publicly performed [the vast majority of the songs that plaintiffs have put at issue in this case]" fails. (Mot. at 7.) Substantial evidence shows that CBS publicly performed many of Plaintiffs' pre-1972 recordings either over the Internet on CBS's Radio.com website (located in New York) and over the airwaves on CBS's terrestrial radio stations (FM, AM, and HD Multicast) during the three years prior to Plaintiffs filing this lawsuit.

#### 1.   CBS Does Not Dispute That It Played 57 Of Plaintiffs' Remastered Recordings

CBS does not dispute that it publicly performed at least 57 remastered copies of

Plaintiffs' pre-1972 recordings during the relevant time period over the Internet on Radio.com and terrestrial radio broadcasts. CBS's discovery responses identified the pre-1972 recordings listed in Schedules A1-A4 of Plaintiffs' FAC that CBS publicly performed during the past four years. According to CBS's counsel, based on a review of "the records produced," "we believe that there are 57 songs that may have been played by CBS." (AMF 20.) CBS provided Plaintiffs with lists identifying those 57 songs. (*Id.*) CBS's admission that there are 57 recordings that "may have been played by CBS" is, at the very least, sufficient to create a genuine issue of material fact that CBS publicly performed these 57 pre-1972 recordings in New York during the relevant time period. These facts preclude summary judgment as to these 57 sound recordings.

CBS further admits that it publicly performed 42 of Plaintiffs' sound recordings on Radio.com's exclusive Internet stations and on terrestrial radio broadcasts. (AMF 22.) With respect to its Internet stations, CBS's Director of Digital Audio, Seth Neiman, testified that every recording that is played on Radio.com's exclusive streaming stations is tracked on CBS's digital library system called Radio 2.0, and that CBS runs reports to collect this information for reporting to SoundExchange for royalty payment purposes. (AMF 23.) In his declaration, Mr. Neiman describes how CBS's employees reviewed those records to determine which of the recordings listed on Plaintiffs' Schedules A1-A4 were publicly performed on Radio.com (on the exclusive stations only) in the three years prior to the filing of the complaint (AMF 24.) CBS's review determined that there is no record of CBS publicly performing 132 (of the 174) of Plaintiffs' recordings, which means that CBS records show that CBS publicly performed 42 of Plaintiffs' recordings on CBS's exclusive Internet stations during the three years prior to the filing of the complaint. (*Id.*). These facts preclude summary judgment as to these sound recordings.

**2.    Triable Issues Of Fact Exist As To CBS's Public Performance Of Plaintiffs' Other Recordings**

Additional, substantial evidence supports the finding that CBS publicly performed another 46 of Plaintiffs' sound recordings, meaning that a material fact dispute exists as to whether CBS publicly performed a total of 88 of Plaintiffs' sound recordings during the three years prior to the filing of the complaint. (AMF 30.)

Neither Mr. Sottolano's nor Mr. Neiman's declarations address public performances by CBS of Plaintiffs' sound recordings on any of CBS's simulcast broadcasts. Mr. Neiman testified that CBS has records, created by third-party Triton, identifying the songs that are publicly performed on its terrestrial radio station simulcasts over Radio.com. ("Triton Reports"). (AMF 31.)  Based on this testimony, CBS's statement that, "[f]or its terrestrial radio service, no playlist records exist," is false.  (Mot. at 9.)  The Triton reports list every song that CBS plays on its terrestrial radio stations as well as CBS's Internet-based performances.

After Mr. Neiman disclosed the existence of the Triton reports, CBS eventually produced them several weeks later. (AMF 32-33.) The Triton Reports for October 2011 to August 2015 show that 86 of Plaintiffs' sound recordings were identified in the Triton Reports and therefore were either publicly performed on a CBS terrestrial radio station (and simulcast by CBS over Radio.com to listeners throughout the U.S.) or on an Internet-only station through Radio.com, or both. (AMF 34.) Thus, Messrs. Sottolano's and Neiman's declarations and the Triton Reports together unequivocally show that CBS has publicly performed—on its terrestrial radio stations in New York, simulcast on Radio.com in New York from its terrestrial radio stations nationwide, and/or streamed through its Internet-only stations on Radio.com in New York—at least 88 of Plaintiffs' pre-1972 recordings. (AMF 35.)  The Triton Reports are substantial evidence of CBS publicly performing Plaintiffs' sound recordings, which precludes summary judgment.

**B.** **The Remastered Copies That CBS Performed Are Pre-1972 Sound Recordings Governed Under New York, Not Federal Law**

Sound recordings fixed prior to February 15, 1972 remain protected under state law. *See* 17 U.S.C. § 301(c).  CBS does not dispute that Plaintiffs' master recordings capture performances that were ***initially fixed*** before February 15, 1972. Nor does CBS dispute that the vast majority of the sound recordings at issue that it broadcasted and streamed are remastered copies of the exact same pre-1972 performances. Instead, CBS premises its motion on a legally-erroneous argument that it played post-1972 sound recordings rather than Plaintiffs' pre-1972 recordings because the copies in its audio files were remastered to a digital format.

Remastering sound recordings from one format to another, along with mechanical processing to optimize the recording for the new format, does not convert a pre-1972 sound recording into a post-1972 sound recording. Converting a pre-1972 sound recording into a derivative work governed under federal copyright law requires more than mechanical optimization—it requires, at the very least, remixing, editing, re-sequencing, or the addition of new sounds. CBS does not offer any evidence of such changes. CBS's expert only determined through his "tests" that the remastered sound recordings are not "identical" to Plaintiffs' original. That is not enough to convert Plaintiffs' pre-1972 recordings into post-1972 works.

**1.** **Remastering Pre-1972 Recordings Does Not Convert Them Into Post-1972 Recordings**

CBS is wrong on the law. Remastering a pre-1972 sound recording from an analog to a digital format does not convert it into a post-1972 sound recording or create a derivative work protectable under the federal copyright act—even if the remastered copy is not "identical" to the original master recording.

CBS fails to cite, much less acknowledge, the only New York case that addressed this exact issue and squarely held that remastering a pre-1972 sound recording does not convert it

into a new sound recording subject to federal copyright law. *Capitol Records, Inc. v. Naxos of Am., Inc.,* 4 N.Y.3d 540, 564-65 (2005). The *Naxos* case began in 1999, when Naxos, without permission, began to reproduce and distribute restorations of Capitol Records' original recordings of certain musical performances from the 1930s, which had been embodied in shellac phonorecords. Capitol Records sued Naxos in federal court for violation of its state common law rights in the original recordings. The parties agreed that the restorations were covered by state common law and not federal law even though the restorations "involved artistic choices and the use of the latest digital software," for which "Naxos needed to employ significant effort to create an entirely new and commercially viable product," and "Naxos worked to create a new product with superior sound." *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 208-09, 214, 215 (S.D.N.Y. 2003). Applying New York common law, the court dismissed, rejecting Capitol's claims.

On appeal, the Second Circuit certified to the New York Court of Appeals the question of whether Naxos had independently created a "new product" from Capitol's original sound recordings when it converted from the shellac medium to digital. *Capitol Records, Inc. v. Naxos of Am., Inc*., 372 F.3d 471, 481 (2d Cir. 2004). In response, the New York Court of Appeals held that Naxos' digitally re-mastered copies of Capitol's recordings were "pre-1972 recordings" subject to protection under New York common law. *Naxos,* 4 N.Y.3d at 564. In so holding, the court found that Capitol's claims could not be defeated based on Naxos' alleged creation of a new product: "[T]he '[i]ndependent creation' of a new product '[can]not consist of actual copying' of an entire work." *Id.* at 564 (quoting *Durham Indus., Inc. v Tomy Corp.*, 630 F.2d 905, 910 (2d Cir 1980)).[1]

_____

[1] The court further found that even if the remastering had created a "new product" subject to federal copyright, Capitol still maintained state common law rights in the "performances

*Naxos* follows a long line of precedent holding that a change in the medium of expression of a work does not change its legal status, even if there are changes to accommodate the new medium.[2]  Likewise, courts have consistently agreed that re-recording a sound recording cannot meet the originality requirements necessary to constitute a derivative work.[3] As discussed, the U.S. Copyright Office also agrees that mechanically processing a pre-1972 sound recording into a new format, without substantively editing the underlying performance, does not create a post-1972 derivative work. (AMF 19.)[4]

---

embodied on the shellac records" to the extent Naxos' remasters "utilize[d] the original elements of the protected performances." *Id*. at 564-65 & n.11. Under this reasoning, CBS's motion fails for an independent reason: Even if the remastered copies of Plaintiffs' sound recordings were subject to federal copyright protection, Plaintiffs would still maintain a separate New York property interest in the performances embodied in the remastered copies, which CBS infringed when it publicly performed them.

[2] *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 502 (2001) ("the 'transfer of a work between media' does not 'alter the character of' that work for copyright purposes"); *Durham*, 630 F.2d at 909 (a change in medium does not affect a copyrighted work's status); *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2nd Cir. 1976).

[3] *See Agee v. Paramount Communs.*, 853 F. Supp. 778, 788-789 (S.D.N.Y. 1994), *aff'd in part on other grounds, rev'd in part on other grounds*, 59 F.3d 317 (2d Cir. 1995) ("Plaintiff has offered no evidence that the sounds in his recording were remixed, or that additional lyrics or musical variations were added, or that defendant took his recording and transformed it into a new original work."); *United States v. Taxe*, 380 F. Supp. 1010, 1013 (C.D. Cal. 1974) ("Obviously, the re-recording of a previously fixed song cannot meet the originality requirements . . .")

[4] U.S. Copyright Office, Library of Congress, Circular No. 56, *Copyright Registration of Sound Recordings* (2014) at 3 (attached as Ex. 4 to Strabone Decl.)

CBS relies on two inapposite cases, neither of which involved pre-1972 recordings. First, CBS cites *Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997). *Maljack* did not involve remastered sound recordings and, contrary to CBS's assertions, the court did not hold that a soundtrack was eligible for copyright protection as a new work because it had simply been "remastered." Instead, *Maljack* involved a "pan and scan" edited version of the 1962 motion picture McClintock!, created to prepare the film for video distribution and television. In creating the 1993 version, in addition to the "pan and scan" changes, plaintiff significantly edited and changed the film's soundtrack by remixing, resequencing, sweetening, equalizing, balancing and stereoizing it, and also adding entirely new sound material. *Id.* at 1418. In a challenge to the plaintiffs' copyright registration of the "pan and scan" version, the district court found the film, inclusive of the soundtrack, subject to federal copyright protection because (taking into account the copyright registration's presumption of validity) it was part of a new audio-visual work. But the court did not find that the copyright registration extended to original elements of McClintock!. Rather, the court found only that the "pan and scan" version and "the sound enhancements are new material protected by copyright." *Id.* at 1428. In marked contrast to *Maljack*, this case involves no new copyrightable, creative contribution to a work.

Second, CBS cites *Pryor v. Jean*, 2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014). That case concerned a 1974 sound recording of David Pryor's "Bumpin' Bus Stop" originally contained on a "Gold Future Record" and later licensed for remastering as a derivative work to Private Stock Records. Consistent with the license, Private Stock, after remastering, obtained a copyright registration that included the "Bumpin' Bus Stop" musical composition. Private Stock later licensed its sound recording of "Bumpin' Bus Stop" to defendants for sampling in movies and television. *Id.* at *3-5. Pryor's heirs sued defendants for copyright infringement, but the district court dismissed because heirs could not show that the samples came

from Pryor's performance on the Gold Future Record (on which the heirs allegedly held a copyright) as opposed to the Private Stock album— on which Private Stock held the copyright and had licensed defendants. *Id.* at *11-12.[5] Like *Maljack*, *Pryor* has no application here: It is undisputed that Plaintiffs' original master recordings and CBS's copies capture the same performance and no one has licensed any remaster to CBS.

The law precluding separate copyright protection for remastered sound recordings mechanically processed for optimization into a new format preserves the integrity of the copyright system. If a derivative work could be created without some substantial, creative modification of the sound recording itself—through mixing, editing, resequencing, or adding and deleting sounds—the copyright duration could be extended indefinitely by continuing to remaster into new formats as technology changes. Today, an owner of a pre-1972 sound recording has rights under state law until 2067. 17 U.S.C. § 301(c). If that owner were able to claim a new copyright by remastering it in a digital format after 2000, then the copyright owner would have rights protectable under federal copyright law for the life of the author plus 70 years. 17 U.S.C. § 302(a). But the scope and duration of copyright cannot be extended. *Taxe*, 380 F. Supp. at 1013 ("[A] common sense reading of the sound recording amendment of 1971 yields the same result, since the restriction of protection to works fixed after February 15, 1972, would be meaningless if works fixed before that date could gain protection simply by being re-recorded in new albums.").

---

[5] Indeed, it was undisputed that the "actual sounds" of David Pryor's voice saying the words "Step Up!," fixed in the Gold Future recording differed from the same words on the Private Stock recording. *See* Motion to Dismiss Third Amended Complaint, *Pryor v. Jean*, No. 13-cv-02867-DDP (C.D. Cal. Dec. 13, 2013), ECF No. 36 at 8:26-9:4 (attached as Ex. 12 to Block Dec.).

2.      **CBS Performed Plaintiffs' Remastered Pre-1972 Recordings, Not New Post-1972 Recordings**

Mr. Geluso examined each sound recording file containing a remaster of Plaintiffs' pre-1972 works in CBS's audio files and compared each to Plaintiffs' original sound recording. In examining the files, Mr. Geluso conducted critical listing tests, waveform analysis, and spectral analysis. From these tests, Mr. Geluso reached two dispositive conclusions: First, for 202 of the 219 sound recordings, Mr. Geluso concluded that CBS's remastered copy contained the same performance captured in Plaintiffs' original master sound recording. (Geluso Dec. ¶¶ 10-11, 39-55.) Second, Mr. Geluso concluded that the CBS remastered copy—while converted from an analog to digital format and optimized for the digital format—contained no remixing or editing, and that no sounds were added or deleted when compared to Plaintiffs' original recordings. (*Id.*) To the contrary, Mr. Geluso found that Plaintiffs' original master recordings were fully embodied in the CBS remasters. (*Id.*) Mr. Geluso's testimony in this regard is not contradicted by CBS's declarants. Mr. Geluso's conclusions alone distinguish this case from both *Maljack* and *Pryor*, and defeat CBS's motion.

Even if CBS's expert (Dr. Begault) disagreed with Mr. Geluso, that would only raise a triable issue of fact precluding summary judgment. But Dr. Begault does not disagree with Mr. Geluso. Indeed, Dr. Begault, after performing his tests, reached the same conclusions: Plaintiffs' original master recordings and the corresponding remastered copies capture the same, pre-1972 musical performances. (AMF 36.) None of Plaintiffs' original master recordings were remixed, edited, resequenced, or had sound added or deleted when remastered from the analog to digital format. (AMF 37, 38.)[6] Finally, Dr. Begault agreed that the performances captured in Plaintiffs'

---

[6] Dr. Beguault's testimony is not surprising in that both he and Mr. Inglot conceded that "remastering" does not involve remixing, rearranging, editing, re-sequencing or the addition of

original master recordings were embodied in the remasters used by CBS. (AMF 39.)

Dr. Begault reached additional conclusions with those tests, but those conclusions are entirely irrelevant to whether the remastered sound recordings are subject to federal copyright protection as derivative works. Dr. Begault admitted that CBS's lawyers asked him to determine whether Plaintiffs' original master recordings "contain the same sound recording that CBS used." (AMF 40.) To determine whether the files contained the "same sound recording," Dr. Begault created tests to determine whether the songs compared were "recorded at the same time and with the same application of recording engineering techniques" (AMF 41-42)—in other words, the same mechanical process that cannot convert a pre-1972 recording into a post-1972 derivative work. (Mot. at 5.)[7] Thus, Dr. Begault's findings that the comparisons "failed" his tests make no difference to whether CBS publicly performed Plaintiffs' pre-1972 recordings.

Aside from Mr. Geluso's analysis, Plaintiffs' pre-1972 recordings have not been converted into post-1972 sound recording based on four additional, legally compelling reasons:

*First*, a pre-1972 sound recording cannot be converted into a post-1972 derivative work. "Under the Copyright Act, a work is not a 'derivative work' unless it is 'based upon one or more preexisting works' and, in order to qualify as a 'preexisting work,' the underlying work must be copyrightable." *Ets-Hokin v. Skyy Spirits Inc*., 225 F.3d 1068, 1078 (9th Cir. 2000); 1-3 Melville

---

new materials to the original sound recording.  (Begault Dep. 114:3-25, 115:8-117:17; Ex. 9; Inglot Dep. 55:3-57:13; Ex. 8.)

[7] Tellingly, Dr. Begault also conceded that his "tests" (which were designed to prove that remastering the sound recordings into a new format involved the use of mechanical processing to digitally optimize the sounds) had never been used, to his knowledge in determining issues of copyright infringement or even described in a publication for such use.  (Begault Dep., 102:24-104:25; Ex. 9.)

B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 3.01. None of Plaintiffs' original recordings are copyrightable under the Copyright Act because they were all fixed before February 1972. Thus, they are not a "pre-existing work" that can be used to create a derivative work. 17 U.S.C. § 301(c).

 *Second*, even if a pre-1972 recording could be a "pre-existing work," any changes during the remastering process are not independent, original expression entitled to protection. "In order for a work to qualify as a derivative work it must be independently copyrightable." *Wood v. Bourne Co.*, 60 F.3d 978, 990-91 (2d Cir. 1995); *McCormick v. Cohn*, 1992 U.S. Dist. LEXIS 21187, at *39 (S.D. Cal. July 31, 1992) ("A derivative work, however, must be 'substantially different from the underlying work to be copyrightable.'" (*quoting Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)). "Independent creation, in turn, means that a work must not consist of actual copying." *Durham*, 630 F.2d at 910 (quoting *L. Batlin*, 536 F.2d at 490). Additionally, "there must be at least some substantial variation (from the underlying work), not merely a trivial variation." *Id.* (quoting *Batlin*, 536 F.2d at 491). Further, "the requirement of originality [cannot] be satisfied simply by the demonstration of 'physical skill' or 'special training' . . ." *Id.* (quoting *Batlin*, 536 F.2d at 491). Here, CBS offers no evidence of independent and original expression, entitled to protection, in the remastered sound recordings. Begault and Inglot agreed that removing Plaintiffs' original recording from the remastered copy would leave nothing to perceive, thus confirming that any mechanical optimizing in the format conversion process could not be independently copyrightable. (AMF 43.)

 *Third*, even if a pre-1972 sound recording could be a "pre-existing work" and the mechanical optimizations in the remastered copy were sufficient to constitute original and independent expression, Plaintiffs never authorized a remastering engineer to make any such alterations. 17 U.S.C. § 103(a) ("protection for a work employing preexisting material in which

copyright subsists does not extend to any part of the work in which such material has been used unlawfully."). The exclusive rights in a copyrighted work include the right to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106(2). Without the owner's consent, however, the preparer of a derivative work cannot create a work protectable by copyright. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012). Plaintiffs never granted a license to create derivative works when converting the pre-1972 recordings from analog to digital format, and CBS does not offer any evidence to the contrary. (AMF 44.) Thus, none of the remastered recordings can be derivative works under federal copyright law.

*Fourth*, even if the remastered copies of the original sound recordings constituted a derivative work under the Copyright Act, any copyright would only protect the new original and independent expression, and not the pre-1972 work. 17 U.S.C. § 103(b) (The copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work."); *Durham*, 630 F.2d at 909 n.6.  The unauthorized use of the pre-existing material as contained in a derivative work is an infringement of the pre-existing material: "[i]t is irrelevant whether the pre-existing work is inseparably intertwined with the derivative work." *Stewart v. Abend,* 495 U.S. 207, 223 (1990); *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976) ("[C]opyright in the underlying script survives intact despite the incorporation of that work into a derivative work").

*Fifth,* the conduct of CBS and its predecessors make clear that neither understood remastered performances were entitled to copyright protection. Contrary to CBS's contentions (which its supporting witnesses disavowed in deposition), neither the distributors nor the Plaintiffs have attempted to register a federal copyright for any of the remastered copies of Plaintiffs' pre-1972 recordings. (AMF 45.) While some of the distributors have registered copyrights for the compilations in the album and the liner notes, the registrations confirm they do

19

not extend to the sound recordings themselves. (AMF 12.) Thus, Plaintiffs would still retain their common law rights in the performance embedded in any derivative works.

## IV.   CBS HAS EXPLOITED PLAINTIFFS' PRE-1972 RECORDINGS WITHOUT PERMISSION

CBS argues that New York common law does not recognize a public performance and reproduction right in pre-1972 recordings. But this court addressed and twice rejected that argument in *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325, 329 (S.D.N.Y. 2014) and again when denying Sirius' request for reconsideration, 2014 U.S. Dist. LEXIS 174907, at *3-12 (S.D.N.Y. Dec. 12, 2014). Although *Flo & Eddie* is before the Second Circuit, Judge McMahon's reasoning is well-grounded in New York law, and should be followed for the reasons explained in the opinion. Other courts have followed Judge McMahon's reasoning and found that common law copyright in New York includes the right of public performance. *Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 U.S. Dist. LEXIS 38007, at *9-10 (S.D.N.Y. Mar. 25, 2015) ("[J]udges in this Court have similarly relied on *Naxos* to conclude that New York would recognize a right of public performance in sound recordings that would mirror the federal copyright in such sound recordings."); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 n.8 (S.D.N.Y 2013). Alternatively, if this Court is unconvinced by these decisions, it should reserve judgment on the issue until the Second Circuit issues its decision in *Flo & Eddie*.

### A.   New York Common Law Provides Exclusive Rights To Publicly Perform And Reproduce Pre-1972 Recordings

#### 1.   New York Common Law Recognizes An Unabridged, Exclusive Property Right To Exclude Others From Profiting From The Labor, Skill, Expenditure, Name And Reputation of Others

Congress unequivocally ceded to the states exclusive authority for protecting pre-1972 recordings, not to be annulled or limited in any respect by federal copyright law until 2067. *See* 17 U.S.C. §301(c).  New York law recognizes that the artistic performances embodied in sound

recordings are a form of property entitled to the full protection of New York law. *Naxos*, 4 N.Y.3d at 562-63; *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 802 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). These property rights act to exclude others from "profit[ing] from the labor, skill, expenditures, name and reputation of others." *Metro. Opera*, 199 Misc. at 796. Indeed, excluding others from unauthorized use of property is the *sine qua non* of ownership. *Dickman v. Comm'r*, 465 U.S. 330, 336 (1984).

### 2.     The Rights of Property Owners of Sound Recordings Are Not Limited To A Single, Limited Right of "First Publication"

CBS argues that New York law recognizes only a single, limited property right of "first publication" in sound recordings. In making this argument, CBS incorrectly relies on three cases—*Palmer v. DeWitt*, 47 N.Y. 532, 536 (1872), *Wilkie v. Santly Bros.*, 91 F.2d 978, 979 (2d Cir. 1937), and *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). As explained in the *Flo & Eddie* decision, none of these cases limit New York's common law public performance right in sound recordings to a "first publication" right. *Palmer* did not involve an interpretation of New York common law or rights of owners of sound recordings under New York common law. *Palmer*, 47 N.Y. at 542. Rather, *Palmer* concerned publication rights of plays under federal law. *Id.* Likewise, *Wilkie* simply stated that New York courts have long recognized that New York common law prohibits the unauthorized copying by a defendant of a plaintiff's work. *Wilkie*, 91 F.2d at 979. Like *Palmer*, *Wilkie* did not concern, or even express a view, concerning the scope of performance rights under New York common law. Finally, *Whiteman*—which was expressly overruled in *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955),— "does not hold that New York does not recognize a public performance right as part of the common law copyright in sound recordings; . . . its actual holding . . . is no longer good law, and has not been for 60 years." *Flo & Eddie, Inc.*, 2014 U.S. Dist. LEXIS 174907, at *4, 8 ("Indeed, had Whiteman been predicated on the absence of a public performance right in sound recordings,

the entire discussion of whether RCA's common law rights were divested by publication would
have been superfluous; RCA could not possibly have 'lost' via publication a right that never
existed in the first place!").

       **3.**        **The Exclusive Right To Public Performance Of A Pre-1972 Recording
                  Is Not Abrogated By The Failure To Enforce**

      CBS's argument that "acquiescence" by the recording industry abridges Plaintiffs'
common law property interests in pre-1972 recordings under New York law is unavailing. *Flo &
Eddie, Inc.*, 62 F. Supp. 3d at 340 (citing *Music Licensing Study: Second Request/or Comments*,
79 Fed. Reg. 42,833-01, 42,834 n.3 (July 23, 2014)).

       **4.**        **Legislative Action Is Not Necessary To Recognize A Protectable
                  Interest In The Public Performance of Pre-1972 Recordings**

      Contrary to CBS's argument, this Court does not need legislative approval to hold that
New York common law recognizes a protectable interest in the public performance of pre-1972
recordings. *Flo & Eddie*, 62 F. Supp. 3d at 344. "In short, general principles of common law
copyright dictate that public performance rights in pre-1972 recordings do exist. New York has
always protected public performance rights in works other than sound recordings that enjoy the
protection of common law copyright." *Id.*

      CBS's reliance on *Palmer*, 47 N.Y. 532, is unavailing. As the Second Circuit explained
in *Naxos*, *Palmer* merely stands for the proposition that "[w]ith regard to literary works, it has
long been the rule that common-law protection ends when a writing is distributed to the public
… because it is at that point that federal statutory copyright protection controls." *Naxos*, 4
N.Y.3d at 560. *Palmer* did not concern New York common law or the protectable interests
afforded to owners of sound recordings. To the contrary, as to sound recordings, "it has been the
law in this state for over 50 years that, in the absence of federal statutory protection, the public

sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection." *Id*.

### 5. *Flo & Eddie* Correctly Interpreted New York Common Law

No law limits the property rights of owners of sound recordings. Judge McMahon thoroughly analyzed New York common law in *Flo & Eddie* and reached the correct result: New York common law recognizes a performance right in sound recordings. That performance right exists today for recordings fixed prior to February 15, 1972. *Flo & Eddie*, 62 F. Supp. 3d at 340-341. CBS offers no compelling reason to depart from that ruling.

### B. New York Common Law Provides Exclusive Rights To Reproduce Pre-1972 Recordings, And the Fair Use Doctrine Does Not Apply

CBS contends that it has the right to reproduce and distribute the pre-1972 recordings because such use is incidental to their public performance, which CBS considers covered under "fair use." This argument was summarily rejected by in *Flo & Eddie*, 62 F. Supp. 3d at 346-48. Judge McMahon reviewed the four fair use factors and concluded that on "all four factors, Sirius's creation of the unauthorized copies fails to qualify as 'fair use.'" *Id*. at 346.

First, in considering the "purpose and character of the use," the court noted that Sirius was a for-profit entity, using the recordings for commercial purposes, and that its use was not transformative—"Sirius does not add anything new or change the Turtles recordings by copying and performing them." *Id*. Second, as to the character of the work, the court found that the recordings were "creative" and thus this factor weighed against Sirius. *Id*. at 347. Third, the "amount and substantiality of the portion used in relation to the copyrighted work as a whole" also heavily weighed against Sirius because it had copied the entire recordings. *Id*. Fourth, with respect to "the effect of the use upon the potential market for or value of the copyrighted work," the court had no trouble weighing this factor against Sirius: "It is, therefore, 'common sense(),'

that Flo and Eddie would suffer market harm when Sirius takes its property and exploits it, unchanged and for a profit.  That exploitation 'supersedes the objects of the original.'"  *Id.* (quoting *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 591 (1994)).

It is well settled under New York law that copying a recording constitutes copyright infringement, even if that recording may lawfully be publicly performed.  *See Agee v. Paramount Communications, Inc.*, 59 F.3d 317 (2d Cir. 1995). *See also Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 548, 551 (S.D.N.Y. 2005) ("The exclusive right to reproduce a copyrighted composition or recording, of which the synchronization right is an aspect or subdivision, is distinct from the right, separately granted to a copyright holder by 17 U.S.C. § 106(4), to perform a copyrighted musical work publicly."). Thus, CBS is separately liable for copying Plaintiffs' sound recordings when it uploaded them to its servers in New York and copied them onto its servers during radio station simulcasts.

### C.  CBS Is Not Entitled To Summary Judgment On Plaintiffs' Unfair Competition Claim.

CBS argues that Plaintiffs cannot prevail on their unfair competition claim because (i) that claim requires the existence of an enforceable right, and (ii) CBS has not acted in bad faith. Both arguments should be rejected.

CBS's repeated unlawful broadcasting of Plaintiff's pre-1972 recordings over Plaintiffs' objections establishes bad faith. *Roy Export Co. Estmt. of Vaduz, Liechtenstein, Black, Inc. A.G. v. Columbia Broad. Sys., Inc.*, 503 F. Supp. 1137, 1151 (S.D.N.Y 1980) (holding that based on CBS's unlawful taking of a protected compilation in violation of New York state law of common law copyright, "it is reasonable to conclude that the finding of unfair competition was based primarily on the use of the Compilation…."); *see also Capitol Records, Inc. v. Wings Digital Corp.*, 218 F. Supp. 2d 280, 286 (E.D.N.Y 2002) (finding plaintiff's allegations that defendants "misappropriated copyrighted music for their own financial gain and in order to realize a

24

commercial advantage over that of the rightful owns of such copyrights" established the requisite

bad faith to support an unfair competition claim). Plaintiffs have provided ample evidence of

CBS's repeated broadcasting of Plaintiffs' pre-1972 recordings. Accordingly, as a matter of law,

CBS is not entitled to summary judgment on Plaintiff's unfair competition claim. *Mr. Water*

*Heater Enter., Inc. v. 1-800-Hot Water Heater*, LLC, 648 F. Supp. 2d 576, 589 (S.D.N.Y. 2009)

("bad faith is a matter for the jury" not properly disposed of on summary judgment).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that CBS's motion be denied.


DATED: April 8, 2016                Respectfully submitted,

MILLER LAW LLC

By:   */s/ Marvin A. Miller*_____
          MARVIN A. MILLER
          (MM9210)
          mmiller@millerlawllc.com
          ANDREW SZOT
          (admitted *pro hac vice*)
          aszot@millerlawllc.com
          KATHLEEN E. BOYCHUCK
          (admitted *pro hac vice*)
          kboychuck@millerlawllc.com
          115 S. LaSalle St., Suite 2910
          Chicago, IL 60603
          T: (312) 332-3400; F: (312) 676-2676

MCKOOL SMITH HENNIGAN, P.C.

By:*/s/ Lawrence M. Hadley*_____
          RODERICK G. DORMAN (SBN 96908)
          (admitted *pro hac vice*)
          rdorman@mckoolsmithhennigan.com
          ROBERT E. ALLEN (SBN 166589)
          (admitted *pro hac vice*)
          rallen@mckoolsmithhennigan.com
          LAWRENCE M. HADLEY (SBN 157728)
          (admitted *pro hac vice*)

lhadley@mckoolsmithhennigan.com
ALAN P. BLOCK (SBN 143783)
(admitted *pro hac vice*)
ablock@mckoolsmithhennigan.com
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
T: (213) 694-1200; F: (213) 694-1234

*Attorneys for Plaintiffs*
ABS ENTERTAINMENT, INC., BARNABY
RECORDS, INC., BRUNSWICK RECORD
CORPORATION and MALACO, IN

26